In The

# United States Court Of Appeals
## For The Fourth Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### MAURICE OWEN WILEY, JR.,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO**

_____

## BRIEF OF APPELLANT
_____

John D. Bryson
WYATT EARLY
  HARRIS WHEELER, LLP
1912 Eastchester Drive
Suite 400
High Point, NC  27265
(336) 819-6016

*Counsel for Appellant*

Mark P. Foster, Jr.
FOSTER LAW
  OFFICES, PLLC
409 East Boulevard
Charlotte, NC  28203
(980) 721-5221

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE..............................................................................2

     Statement of Facts............................................................................3

SUMMARY OF ARGUMENT .............................................................................4

ARGUMENT .......................................................................................................6

    I.     THE COURT ERRONEOUSLY DENIED WILEY'S MOTION TO DISMISS COUNT THREE FOR FAILURE TO STATE AN OFFENSE AND THEN CONSTRUCTIVELY AMENDED THAT COUNT BY INSTRUCTING THE JURY ON AN UNDERLYING CRIME OF VIOLENCE NOT ALLEGED IN THE INDICTMENT ...................................................6

         A.    STANDARD OF REVIEW ........................................................6

         B.    DISCUSSION OF THE ISSUE ................................................7

    II.    THE COURT ERRONEOUSLY DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29.........................................................................................12

         Single Conspiracy Issue ....................................................................12

             THERE WAS NOT EVIDENCE OF TWO SEPARATE CONSPIRACIES; THE TRIAL COURT ERRED BY NOT GRANTING WILEY'S MOTION TO DISMISS COUNT THREE ....................................................................12

Standard of Review .........................................................12

Discussion of the Issue ...................................................12

Interstate Nexus Issue...........................................................16

AS TO COUNTS ONE, TWO AND THREE, THERE WAS INSUFFICIENT EVIDENCE THAT WILEY CONSPIRED TO COMMIT, OR ATTEMPTED TO COMMIT, A ROBBERY THAT WOULD OBSTRUCT, DELAY, OR AFFECT INTERSTATE COMMERCE ............16

Standard of Review .........................................................16

Discussion of the Issue ...................................................17

III.   THE COURT ERRED IN DENYING THE APPELLANT'S *BATSON* OBJECTION TO THE GOVERNMENT'S USE OF PEREMPTORY STRIKES AS TO JURORS ANITRA INGRAM AND JANET RIDDLE WHERE THE GOVERNMENT'S STRIKES WERE SUBSTANTIALLY MOTIVATED BY RACE...................................................20

A.   STANDARD OF REVIEW ......................................20

B.   DISCUSSION OF THE ISSUE...............................20

FACTS ..................................................................21

ANALYSIS............................................................24

Evidence of the Prosecutor's Disparate Questioning of Black and White Prospective Jurors......25

Side-By-Side Comparisons of Black Prospective Jurors Who Were Struck and White Prospective Jurors Who Were Not Struck in the Case.......................28

Trickery.................................................................30

IV.    THE COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW BY SUSTAINING THE GOVERNMENT'S OBJECTION TO DEFENSE COUNSEL'S ARGUMENT REGARDING REASONABLE DOUBT ..................31

      A.    STANDARD OF REVIEW ......................................................31

      B.    DISCUSSION OF THE ISSUE ...............................................32

            FACTS .................................................................................32

            ANALYSIS ..........................................................................35

CONCLUSION ........................................................................................37

CERTIFICATE OF COMPLIANCE ......................................................39

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Batson v. Kentucky*,
476 U.S. 79, 106 S. Ct. 1712, L. Ed. 2d 69 (1986) ...............................*passim*

*Blockburger v. United States*,
284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932) .................................15, 16

*Cage v. Louisiana*,
498 U.S. 39, 111 S. Ct 328, 12 L. Ed. 2d 339 (1990) ............................35, 37

*Coffin v. United States*,
156 U.S. 432 (1895)...................................................................................35

*De Belbruno v. Ashcroft*,
362 F.3d 272 (4th Cir. 2004) .........................................................................31

*Estelle v. McGuire*,
502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 3805 (1991) .............................37

*Flowers v. Mississippi*,
139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019)......................................25, 28, 29

*Hopt v. Utah*,
120 U.S. 430 (1887)...................................................................................36

*Howard v. Moore*,
131 F.3d 399 (4th Cir. 1997) .......................................................................25

*In re Winship*,
397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) .........................32, 35

*Jones v. Plaster*,
57 F.3d 417 (4th Cir. 1995) ..........................................................................20

*Miller-EL v. Dretke*,
545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) ....................*passim*

*Snyder v. Louisiana*,
    552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008) ...........................24

*Stirone v. United States*,
    361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960) ................................9, 10

*Sullivan v. Louisiana*,
    508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) ...........................35

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) ...........................................................12

*United States v. Davis*,
    139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019)......................................8

*United States v. Grimmond*,
    137 F.3d 823 (4th Cir. 1998) .........................................................24

*United States v. Kingrea*,
    573 F.3d 186 (4th Cir. 2009) ....................................................... 6-7

*United States v. Leavis*,
    853 F.2d 215 (4th Cir. 1988) ...................................................12, 13

*United States v. Malindez*,
    962 F.2d 332 (4th Cir. 1992) .........................................................24

*United States v. Malloy*,
    568 F.3d 166 (4th Cir. 2009), *cert. denied*,
    559 U.S. 991 (2010)..................................................................7

*United States v. Oriakhi*,
    57 F..3d 1290 (4th Cir. 1995) .......................................................36

*United States v. Ragins*,
    840 F.2d 1184 (4th Cir. 1988) .......................................................15

*United States v. Randall*,
    171 F.3d 195 (4th Cir. 1999) .....................................................9, 10

*United States v. Simmons*,
    11 F.4th 239, 268 (4ᵗʰ Cir.), *cert. denied*,
    142 S. Ct. 574 (2021) .............................................................10, 11

*United States v. Taylor*,
    754 F.3d 217 (4ᵗʰ Cir. 2014) .........................................................16

*United States v. Taylor*,
    942 F.3d 205 (4ᵗʰ Cir. 2019) .........................................................18

*United States v. Taylor*,
    979 F.3d 203 (4ᵗʰ Cir. 2020), *cert. granted*,
    141 S. Ct. 2882, No. 20-1459 (July 2, 2021) ..................................8

*United States v. Wang*,
    222 F.3d 234 (6ᵗʰ Cir. 2000) ...................................................18, 19

**Statutes:**

18 U.S.C. § 922(g) .............................................................................2

18 U.S.C. § 924(c) .....................................................................*passim*

18 U.S.C. § 924(c)(3) ........................................................................7

18 U.S.C. § 924(c)(3)(A) ...................................................................8

18 U.S.C. § 924(c)(3)(B) ...................................................................8

18 U.S.C. § 924(o) ...............................................................1, 2, 7, 11

18 U.S.C. § 1951(a) ....................................................................*passim*

18 U.S.C. § 3231 ...............................................................................1

28 U.S.C. § 1291 ...............................................................................1

**Constitutional Provisions:**

U.S. Const. amend. V........................................................................*passim*

**Rules:**

Fed. R. Crim P. 29.............................................................................1, 5, 12

**Other Authorities:**

*Fifth Circuit Pattern Jury Instructions, Criminal Cases 1.05,*
*Presumption of Innocence, Burden of Proof, Reasonable Doubt*............................36

## STATEMENT OF JURISDICTION

This is a direct appeal by Appellant, Maurice Owen Wiley, Jr., of his conviction and sentence in a federal criminal case in the Middle District of North Carolina. Jurisdiction was conferred on the United States District Court by 18 U.S.C. § 3231. Appellate jurisdiction is conferred on this Court by 28 U.S.C. § 1291. Appellant was found guilty by a jury of one count of conspiracy to commit Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a), one count of attempted Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a), and one count of conspiracy to possess firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(o). (JA 1453-4). The jury verdicts were entered on April 27, 2021. (JA 1453-4) Sentence was imposed by the District Court on August 18, 2021. (JA 1547) The Court's written judgment issued on August 19, 2021. (JA 1547-54) Appellant filed a timely Notice of Appeal on August 19, 2021. (JA 1455-6).

## STATEMENT OF THE ISSUES

I.    THE COURT ERRONEOUSLY DENIED WILEY'S MOTION TO DISMISS COUNT THREE FOR FAILURE TO STATE AN OFFENSE AND THEN CONSTRUCTIVELY AMENDED THAT COUNT BY INSTRUCTING THE JURY ON AN UNDERLYING CRIME OF VIOLENCE NOT ALLEGED IN THE INDICTMENT.

II.   THE COURT ERRONEOURLY DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29.

III.  THE COURT ERRED IN DENYING THE APPELLANT'S *BATSON* OBJECTION TO THE GOVERNMENT'S USE OF PREMPTORY STRIKES AS TO JURORS ANITRA INGRAM AND JANET RIDDLE WHERE THE GOVERNMENT'S STRIKES WERE SUBSTANTIALLY MOTIVATED BY RACE.

IV.  THE COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW BY SUSTAINING THE GOVERNMENT'S OBJECTION TO DEFENSE COUNSEL'S ARGUMENT REGARDING REASONABLE DOUBT.

## STATEMENT OF THE CASE

On January 4, 2021, a Federal Grand Jury for the Middle District of North Carolina returned a six-count superseding indictment against Appellant and other co-defendants. (JA 25-9) In Count One, Appellant was charged with conspiracy to commit Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a); in Count Two, Appellant was charged with attempted Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a); in Count Three, Appellant was charged with conspiracy to possess firearms in furtherance of a crime in violation of 18 U.S.C. § 924(o); and in Count Four,  Appellant was charged with possession of  ammunition by a felon in violation of 18 U.S.C. § 922(g).  (JA 25-9) Appellant was not charged in the remaining two counts of the indictment.  Appellant entered pleas of not guilty to all charges and his jury trial began on April 19, 2021. (JA  17).  On April 27, 2021, Appellant's jury returned verdicts of guilty to Counts One through Three, and he was acquitted on Court Four. (JA 1453-4).

Appellant's presentence investigation report set his guideline range at life imprisonment. (JA 1681) However, the statutory maximum for all offenses amounted to 720 months imprisonment. (JA 1681). The sentencing hearing took place on August 18, 2021. The court imposed a sentence of 240 months on Count One to be followed by a 240 month sentence on Court Two to be followed by an 80 month sentence on Count Three for a total of 560 months. (JA 1547-54)

**Statement of Facts**

The Government's evidence tended to show that Appellant, Darryl Bradford, Hykeem Cox, Semaj Bradley, and Charles Daniels planned to rob Wai Ping Chan and Hong Zheng, who owned the China Wok Restaurant located in Durham, North Carolina. (JA 1648) On April 13 and 14, 2018 the group conducted surveillance by driving to the China Wok and then to 4617 Carlton Crossing, Chan and Zheng's residence. (JA 1648) The plan was to commit the robbery at the owners' residence, which was a short distance away from the restaurant. (JA 1112)

On Sunday, April 15, 2018 at approximately 10:22 p.m., Chan and Zheng pulled into the driveway of their residence. (JA 335) Zheng remained in the vehicle while Chan went to the front door of the residence. (JA 336-7) As part of a planned routine, when Ms. Chan got to the front door, her son, Eastern Zheng handed her a 9 mm semi-automatic handgun. (JA 336) As Chan stood on the front porch, she was approached by men armed with weapons who began shooting. (JA

337) Chan returned fire. After numerous shots were fired both by Chan and her assailants, the would be robbers fled the scene in a vehicle. (JA 338) The crime scene investigation revealed the recovery of numerous shell casings of 9 mm, .40 and .45 caliber. Mr. Zheng, whose vehicle was found at the bottom of the driveway, had been shot and killed during the exchange. (JA 380-2). Investigators later determined that the vehicle used in the crime was a Lincoln MKX that had been rented by Taquila House and used by Appellant. (JA 1650) A computer infotainment system installed in the vehicle provided accurate GPS information identifying it as the vehicle used in the attempted robbery. (JA 1231-6) Hykeem Cox, one of the co-defendants, cooperated and testified on behalf of The Government. He admitted his involvement in the offense and identified the Appellant as the driver of the vehicle. (JA 1113) Cox also acknowledged that in the early stages of the investigations, he blamed the Appellant as the "trigger man" who killed Mr. Zheng. (JA 1124-5) Cox later would acknowledge that he was actually the person who shot and killed Mr. Zheng. Cox still maintained that Appellant had fired a weapon during the attempted robbery.

## SUMMARY OF ARGUMENT

Appellant sets forth four issues for this court on appeal. First, the court's denial of Appellant's motion to dismiss Count Three. In Count Three, Appellant was charged with conspiracy to possess firearms in furtherance of a crime of

violence. The indictment specifically alleges that the crime of violence is an offense under Subsection (c) of Title 18 U.S.C. § 924. 18 U.S.C. § 924(c) is not itself a crime of violence. Accordingly, the indictment failed to state a criminal offense. The court then, over defense objections, instructed the jury that the crime of violence referenced in Count Three was a Hobbs Act robbery. This constitutes a prohibited constructive amendment of the indictment, in violation of Appellant's Fifth Amendment grand jury rights.

Next, the court denied defendant's motion for judgment of acquittal under Rule 29. Appellant takes issue with the court's ruling in two regards. First, regarding Counts One and Three, the government presented evidence of a single conspiracy and not two separate conspiracies. Appellant was convicted of two separate conspiracies, which exposed him to multiple punishments for the same offense. Also, the government's evidence was insufficient to establish a nexus between the robbery and its effect on interstate commerce. This failure impacts Counts One, Two and also Count Three as the court constructively amended the indictment.

Next, Appellant raises the denial of his *Batson* objection to the government's use of peremptory strikes. The government struck two out of three black jurors submitted to them in the first pass during jury selection. The Court denied Appellant's challenge despite the prosecutor's disparate questioning of black and

white prospective jurors. Further, a side-to-side comparison of black jurors who were struck with white jurors who were not struck showed a disparity. Finally, the process employed by the government, which formed the basis for its race neutral explanation for the challenges amounts to what the Supreme Court defined as trickery in *Miller-EL v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. E. 2d 196 (2005).

Finally, Appellant submits that during defense counsel's closing argument, the court sustained the government's objection to his analogy regarding proof beyond a reasonable doubt. Counsel's analogy was correct in law. The court's actions allowed the jury to infer a standard of proof that was below proof beyond a reasonable doubt thereby violating Appellant's due process rights.

## ARGUMENT

I.    THE COURT ERRONEOUSLY DENIED WILEY'S MOTION TO DISMISS COUNT THREE FOR FAILURE TO STATE AN OFFENSE AND THEN CONSTRUCTIVELY AMENDED THAT COUNT BY INSTRUCTING THE JURY ON AN UNDERLYING CRIME OF VIOLENCE NOT ALLEGED IN THE INDICTMENT.

### A.    STANDARD OF REVIEW

Whether an indictment properly charges an offense is a matter of law which the Court considers *de novo* if the defendant made a timely objection to the indictment. When the defendant challenged the sufficiency of an indictment prior to the verdict, the Court applies a heightened scrutiny. *United States v. Kingrea*,

573 F.3d 186, 191 (4th Cir. 2009). This Honorable Court reviews *de novo* a claim of constructive amendment to an indictment. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).

## B.   DISCUSSION OF THE ISSUE

Count Three charged Wiley with violating Title 18, Section 924(o), by conspiring with his codefendants to possess firearms in furtherance of a "crime of violence, to wit: an offense under subsection (c) of Title 18, United States Code, Section 924." Wiley maintained that Count Three did not state an offense because it did not allege an underlying crime of violence. Instead, Count Three described the underlying crime of violence as "an offense under subsection (c) of Title 18, United States Code, Section 924." (J.A. 27). Wiley had filed a pretrial motion to dismiss Count Three for failing to state an offense. (J.A. 13, Document 236) The District Court denied this motion. (J.A. 15, Document 244).

18 U.S.C. § 924(o) makes it an offense for a person to conspire to commit an offense under subsection (c), which prohibits, *inter alia,* the use or carrying of a firearm during and in relation to a crime of violence or the possession of a firearm in furtherance of a crime of violence.

Section 924(c)(3) defines "crime of violence" as follows:

an offense that is a felony and—

(A)     has as an element the use, attempted use, or threatened use of
        physical force against the person or property of another; or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The definition included in Section 924(c)(3)(B) above was known as the "residual clause," and was held unconstitutionally vague in *United States v. Davis*, 139 S. Ct. 2319, 2336, 204 L. Ed. 2d 757 (2019). Thus, an underlying offense now qualifies as a crime of violence only if it falls within the "force clause" of Section 924(c)(3)(A). Therefore, an offense qualifies only if it has as an element "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).

Here, Count Three alleged as its underlying crime of violence "an offense under subsection (c) of Title 18, United States Code, Section 924." Thus, the issue here is whether a violation of Section 924(c) is in and of itself a crime of violence.

If the predicate offense alleged as a "crime of violence" does not invariably require the use, attempted use, or threatened use of physical force, then it does not qualify as a crime of violence. *United States v. Taylor*, 979 F.3d 203, 207 (4th Cir. 2020), *cert. granted*, 141 S. Ct. 2882, No. 20-1459 (July 2, 2021). In *Taylor*, this Honorable Court held that attempted Hobbs Act robbery is not a crime of violence "because the elements of attempted Hobbs Act robbery do not invariably require 'the use, attempted use, or threatened use of physical force.'" *Id.,* at 205, 210.

Here, the government's wording of Count Three's Section 924(c) charge specified that the underlying crime of violence was itself a violation of Section 924(c). This circular pleading did not allege a crime of violence and therefore the district court should have granted Wiley's motion to dismiss for failure to state an offense.

At the conclusion of trial, over defense objection, the jury was instructed as to Count Three that a Hobbs Act robbery, not alleged as the underlying crime of violence in Count Three, was a crime of violence. (J.A. 1304-1305, 1388-1390). Wiley submits that this constitutes a prohibited constructive amendment of the indictment.

The Fifth Amendment "guarantees that a criminal defendant will be tried only on charges in a grand jury indictment" and therefore "only the grand jury may broaden or alter the charges in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (cites omitted). Since 1887, the United States Supreme Court has held that an indictment returned by a grand jury may not be broadened by amendment unless by the grand jury itself. *Stirone v. United States*, 361 U.S. 212, 215-217, 80 S. Ct. 270, 272, 4 L. Ed. 2d 252 (1960).

If a defendant is tried and convicted on charges not specifically alleged in the indictment, "[t]he resulting incongruity between the indictment and the conviction that a constructive amendment causes 'destroys the defendant's

substantial right to be tried only on charges presented in the indictment.'" *United States v. Simmons*, 11 F.4th 239, 268 (4th Cir.), *cert. denied*, 142 S. Ct. 574 (2021) (citations omitted). Consequently, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, *supra,* 80 S. Ct. at 273.

The government is not obligated to allege a specific predicate offense in a Section 924(c) indictment. However, if they choose to allege a specific predicate offense, they are required to prove the elements of that specified predicate offense. *United States v. Randall*, *supra,* 171 F.3d at 205, 208. In the *Randall* case, the government alleged in the 924(c) charges in the indictment that the predicate drug trafficking offense was distribution. However, the government in its evidence and argument, and the court in its instructions to the jury, broadened the bases of conviction to include the predicate offense of possession with intent to distribute. This Honorable Court found this to be a constructive amendment of the indictment and reversed the defendant's convictions on those charges. *Id.,* at 210.

In a recent case decided by this Honorable Court, the government had indicted the defendant on several Violent Crimes in Aid of Racketeering ("VICAR") counts. Those counts alleged two predicate offenses which were both violations of Virginia state statutes. However, the jury was instructed as to violation of a third statute as a predicate offense. That offense was not alleged in

the indictment. Because the addition of the third statute as a predicate offense provided the jury with a broader basis for a VICAR assault conviction than the predicate offenses alleged in the indictment, this Honorable Court held that the district court's instruction constituted a constructive amendment and reversed the defendant's convictions on those counts. *United States v. Simmons*, 11 F.4th 239, 266-269 (4th Cir. 2021).

In the instant case, Count Three charged Wiley with conspiring to possess firearms "in furtherance of a crime of violence, to wit: an offense under subsection (c) of Title 18, United States Code, Section 924; in violation of Title 18, United States Code, Section 924(o)." (J.A. 27). Having chosen to allege that the predicate crime of violence was a violation of Section 924(c), the government limited itself to proof of that purported predicate offense. Instead, the government presented evidence and argument, and the district court so instructed, that the predicate crime of violence here was a Hobbs Act robbery. (J.A. 1304-1305, 1388-1390).

Count Three did not contain any allegation that the predicate crime of violence was a Hobbs Act robbery. Instead, Count Three alleged only that the crime of violence was an offense under Section 924(c). By allowing the government to present evidence and to argue that the underlying crime of violence was a Hobbs Act robbery, and by instructing the jury (over defense objection) that Hobbs Act robbery was the underlying predicate offense, the district court

impermissibly broadened the bases of conviction. Accordingly, this was a constructive amendment of the indictment in violation of Wiley's Fifth Amendment grand jury rights.

Thus, not only did Count Three fail to state an offense, but the district court constructively amended Count Three in violation of the Fifth Amendment. Therefore, Wiley's conviction on Count Three must be reversed.

II.     THE COURT ERRONEOUSLY DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29.

### Single Conspiracy Issue

**THERE WAS NOT EVIDENCE OF TWO SEPARATE CONSPIRACIES; THE TRIAL COURT ERRED BY NOT GRANTING WILEY'S MOTION TO DISMISS COUNT THREE.**

### Standard of Review

The standard of review of whether the trial court properly instructed the jury on a single versus multiple conspiracies is abuse of discretion. *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988). The standard of review for sufficiency of the evidence is whether there is substantial evidence, taking the view most favorable to the Government, to support the jury's verdict. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).

### Discussion of the Issue

Count One alleged that Wiley conspired with his codefendants to commit a Hobbs Act robbery of the owners and employees of China Wok by means of actual

12

and threatened force, violence, and fear of injury between April 13 and 15, 2018. Similarly, Count Three alleges that Wiley conspired with his codefendants between April 13 and 15, 2018, to possess firearms in furtherance of a crime of violence, which the Court, over defense objection, instructed was a Hobbs Act robbery.

"A single conspiracy exists where there is 'one overall agreement' (*cite omitted*) or 'one general business venture.' (*cite omitted*). Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key acts, methods, and goals." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988). "The question whether the evidence shows a single conspiracy or multiple conspiracies, however, is one of fact and is properly the province of the jury." *Id.,* Thus, because the question of single versus multiple conspiracies is one of fact for the jury, it is properly the subject of a motion for judgment of acquittal for insufficient evidence for a rational trier of fact to have found guilt.

Here, there was no testimony at trial as to there being anything but a single agreement to rob the Zheng family at their home. There was no evidence that there was an agreement to rob the family and then a separate agreement to use guns in the robbery.

Codefendant Hykeem Cox was the only cooperating codefendant to testify at trial as to how the robbery was planned and conducted. He did not testify that there was an agreement to rob the family and then a separate agreement to use guns in

that robbery. Instead, he testified to a single agreement to commit an armed robbery of the family.

Cox testified that the group decided to rob the owners of China Wok at their home because they were believed to keep their money at home. (J.A. 1110-1111). The following dialogue took place between the prosecutor and Cox:

> Q    Why did you have guns?
> A    Because we was going to commit a robbery.
> Q    Was that the agreement between you –
> A    Yes, sir.
> Q    -- to have guns to commit a robbery?
> A    Yes, sir.      (J.A. 1114).

When asked later by the prosecutor why they had guns, Cox explained as follows: "Because we about to rob them." (J.A. 1118). Further, Cox testified as follows:

> Q    Why was it necessary to make sure he (codefendant Charles Daniels AKA "Murda") was armed?
> A    Because everybody needs a gun.
> Q    Why do you need a gun?
> A    Because we fixing to go rob somebody. (J.A. 1119).

Cox's testimony makes clear that there were not two separate conspiracies. Instead, the necessity that the robbers be armed was inherent in the nature of the conspiracy to commit a Hobbs Act robbery. Cox explained that the reason they were armed was that they were going to commit a robbery, a crime that in his mind necessarily includes guns. As stated above, Cox testified that "the agreement" was

"to have guns to commit a robbery." (J.A. 1114). This was a single agreement, a single conspiracy.

The actors and goals of the conspiracies alleged in Counts One and Three were the same, indicating that this was one conspiracy, not two. There was no evidence of two separate agreements. There was an overlap of key acts, methods, and goals.

Whether there were two conspiracies versus one conspiracy had a huge impact on sentencing in this case. The Double Jeopardy Clause of the Fifth Amendment protects a person from being twice put in jeopardy for the same offense. This constitutional guarantee has two components, one of which is to protect a defendant from "the imposition of cumulative punishments for the 'same offense' in a single criminal trial." *United States v. Ragins*, 840 F.2d 1184, 1187 (4th Cir. 1988). This provision is violated by conviction and punishment of a defendant for multiple conspiracy charges that are actually the same offense. *Id.*, at 1187-1188. In this context, the Double Jeopardy Clause's role is to ensure that a defendant does not receive more than one punishment for something the legislature has defined as one crime. *Id.*, at 1188. The test for determining whether two charged offenses are actually the same offense is the *Blockburger* test, *i.e.*, if each offense requires proof of a fact which the other does not, then they are separate offenses. *Id.,* at 1188.

Here, Wiley was sentenced to 240 months on Count One and 80 months consecutive on Count Three. (J.A. 1547-1548). Wiley submits this violated the Double Jeopardy Clause because Count One and Count Three were the same offense. While Count Three required proof that the conspiracy included use/carrying/possession of firearms that Count One did not, Count One did not require proof of any facts beyond those required by Count Three. As instructed by the district court, Count Three's predicate offense was a Hobbs Act robbery, the same object of the conspiracy charged in Count One. Thus, Count One did not require proof of any element not contained in Count Three. Therefore, application of the *Blockburger* test establishes that these were the same offense. Wiley's guarantee against Double Jeopardy was violated by being sentenced to a consecutive 80-month sentence on Count Three.

## Interstate Nexus Issue

**AS TO COUNTS ONE, TWO AND THREE, THERE WAS INSUFFICIENT EVIDENCE THAT WILEY CONSPIRED TO COMMIT, OR ATTEMPTED TO COMMIT, A ROBBERY THAT WOULD OBSTRUCT, DELAY, OR AFFECT INTERSTATE COMMERCE.**

### Standard of Review

On an appeal contesting the sufficiency of the evidence of interstate commerce nexus, the appellate court views the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. The verdict will be upheld if supported by substantial evidence. *United States v. Taylor*, 754 F.3d 217, 224 (4th Cir. 2014).

**Discussion of the Issue**

Count One charged a conspiracy to commit a Hobbs Act robbery. Count Two charged an attempted Hobbs Act robbery. Count Three, based on the district court's instructions, required proof that a Hobbs Act robbery was the object of a conspiracy to use, carry, and/or possess firearms. Thus, all three counts required proof of the interstate commerce nexus that is an element of a Hobbs Act robbery.

The government called Hykeem Cox as the only cooperating codefendant to testify as to the agreement of the co-conspirators and their actions on the night in question. His testimony made clear that the conspirators planned to rob the victims because they were Asian people who did not believe in banks and would store large quantities of cash at home. (J.A. 1111). Wai Ping Chan, the widow of murdered Hong Zheng, testified that she and her husband owned and operated the restaurant and would bring the money home from the restaurant each day. (J.A. 335). Her testimony indicated that this money was theirs to keep. (J.A. 340-341).

No evidence was presented that the robbers targeted the Zheng family because their restaurant engaged in interstate commerce. Instead, it was because the robbers believed the family kept their money at home as opposed to depositing it in a bank. The government elicited testimony that from Wai Ping Chan that the restaurant was closed for about a month after the robbery, but there was no testimony that they ceased ordering or receiving goods from out of state during this time. (J.A. 340).

While this Honorable Court has held that the government need only prove a minimal, even *de minimis,* effect on interstate commerce to prove the jurisdictional predicate of a Hobbs Act robbery, there still must be some effect. *See United States v. Taylor*, 942 F.3d 205, 218-219 (4th Cir. 2019). One way the government can do this is "by showing a reasonable probability that the defendants' actions depleted the assets of an entity engaged in interstate commerce" *Id.*, at 218. Here, however the assets of China Wok would not have been depleted even if the robbery had succeeded—the money that the Zheng family would bring home was theirs to keep and was no longer an asset of the business. Thus, there is no basis for determining a reasonable probability that a completed robbery would have depleted the assets of an entity engaged in interstate commerce.

In *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000), the defendant had been convicted of a Hobbs Act robbery. The underlying facts were that a husband and wife were owners of a Chinese restaurant in Tennessee. They were robbed in their home of $3,000 that had been withdrawn from the wife's personal bank account and $1,200 cash proceeds brought home from the restaurant that day. The Court stated as follows:

> But when the government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one—not one that is fortuitous or speculative. We have suggested that the Government might make such a showing by

demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce.
*Id.*, at 239-240.

The Court reversed that defendant's Hobbs Act robbery conviction, explaining as follows:

> Wang robbed private citizens in a private residence of approximately $4,200, a mere $1,200 of which belonged to a restaurant doing business in interstate commerce. The Government made no showing of a substantial connection between the robbery and the restaurant's business, and the district court held that "there is no evidence of an effect on interstate commerce."

*Id.*, at 240.

Like *Wang*, this case involves an assault on the home of the owners of a restaurant. Like *Wang*, the government in the instant case presented no evidence that the victims were targeted because the robbers knew of or were motivated by the victims' connection to interstate commerce. While the government elicited testimony from Wai Ping Chan that the restaurant was closed for about a month following her husband's murder, there was no testimony indicating that the restaurant ceased ordering and receiving goods from out of state during that time. There was also no testimony on whether the restaurant's operations would have been impacted if the robbers had succeeded in stealing money from the home of the Zhengs on the night in question. Hykeem Cox testified that the reason the conspirators agreed to rob the Zheng family was their belief that Asians kept their money at home, not any knowledge on their part of the restaurant's involvement in

interstate commerce. Therefore, there was insufficient evidence that the robbers conspired to, or attempted to, affect interstate commerce.

Accordingly, the district court erred in denying Wiley's motion to dismiss Counts One and Two for insufficient evidence. Similarly, because the district court instructed the jury that the predicate crime of violence on Count Three was a Hobbs Act robbery, that Count also required proof of a nexus with interstate commerce. Because there was insufficient evidence of interstate nexus, Count Three should also have been dismissed.

III.   THE COURT ERRED IN DENYING THE APPELLANT'S *BATSON* OBJECTION TO THE GOVERNMENT'S USE OF PEREMPTORY STRIKES AS TO JURORS ANITRA INGRAM AND JANET RIDDLE WHERE THE GOVERNMENT'S STRIKES WERE SUBSTANTIALLY MOTIVATED BY RACE.

   A.   **STANDARD OF REVIEW**

"A finding by the trial court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference by this court; we review that finding only for clear error." *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995).

   B.   **DISCUSSION OF THE ISSUE**

During jury selection, the initial panel of prospective jurors contained three black jurors. The government exercised peremptory challenges to excuse two of the three black jurors. Defendant objected and the court conducted a *Batson*

analysis. While the court overruled the Defendant's challenge, the evidence would show that the government's use of peremptory strikes was substantially motivated by race. This is demonstrated in three ways. First, there was evidence of the prosecutors disparate questioning of black and white prospective jurors. Second, a side-by-side comparison of black prospective jurors struck with white prospective jurors who were not struck, shows a disparity. Finally, the process the prosecutors employed during jury selection amounts to what the Supreme Court referred to as trickery in *Miller-EL v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. E. 2d 196 (2005).

## FACTS

At the beginning of jury selection, the court called 12 jurors to the box for examination. (JA 59-60) Of those jurors, there were three that self-identified as black. They were Anitra Ingram, Janet Riddle, and Anthony Okafor. (JA 1559) The remainder of the jurors self-identified as white. (JA 1559). When allowed to exercise peremptory challenges, the government used two of its peremptory challenges to excuse jurors Anitra Ingram and Janet Riddle. (JA 116). Appellant objected and raised a *Batson* challenge. (JA 103)

The court found that two of the jurors that the government had struck were African Americans and the government agreed. (JA 102-3) The court inquired of Appellant as to his contention regarding a *prima facie* challenge. Appellant noted

that three African American jurors had been submitted to the government for their review and that they had exercised peremptory challenges to strike two out of the three. Appellant pointed out that the government had exercised challenges to eliminate two-thirds of potential African American jurors and that was the basis for a *prima facie* case under *Batson*. (JA 104) The court went forward presuming that Appellant had made a *prima facie* showing of the exercise of peremptory challenges on the basis of race. (JA 128) The court then asked the government to state their reasons for the exercise of their challenges. The government's stated reason for excusing both Ms. Ingram and Ms. Riddle was the same.

During jury selection, the jurors were asked to fill out a questionnaire. (JA 1565-1640) Counsel were given these questionnaires to review prior to jury selection, only if a member of the panel had answered "yes" to one of the questions. (JA 1562-4) In the first pass of jurors, the parties were given an opportunity to review the questionnaires submitted by both Ms. Ingram and Ms. Riddle. Both had answered Question No. 4 "yes," indicating that either they or a family member had been a plaintiff or a defendant in a court case, whether it be civil, criminal or domestic. (JA 1565-6, 1569-70)

After questioning by the court, the attorneys were brought to the bench and allowed to suggest follow-up questions. Ultimately, the government asked the court to re-ask, in oral form, the question specified on the questionnaire under

Question 4.[1] (JA 110) In response to being asked the same question again on the questionnaire orally by the court, neither Ms. Ingram, nor Ms. Riddle responded.[2] (JA 111-12) The government argued that their failure to respond affirmatively to the question in open court deprived them of an opportunity to make follow-up questions and that it showed lack of candor. (JA 112-114) Appellant argued that because they had disclosed this information on their questionnaire, it could not be construed as any attempt at deception. (JA 113) Appellant also argued that asking the exact same question that they had already been previously asked rather than a follow-up question based on their answers to the questionnaire, was itself a pretext. Asking the same question twice was not a real attempt at gathering information on which to intelligently exercise a peremptory challenge. (JA 126-127) It should be noted that juror Riddle specifically indicated on her questionnaire that she would find it embarrassing to discuss her answer to Question 4 in open court. (JA 1569).

---

[1] There was initially some confusion as to what the precise follow-up question the government was requesting the court to ask. The court initially asked the question in several different variations before the court finally re-asked Question 4 as it appeared on the questionnaire.

[2] While Ms. Ingram did not raise her hand when asked Question 4 from the questionnaire, she did initially raise her hand when the court asked its first version of the follow-up question, in which the court asked whether any jurors themselves had been a plaintiff or defendant in a case. Upon further questioning, Ingram indicated that she had responded erroneously. (JA 97)

The court ultimately denied Appellant's challenge, finding that Appellant had failed to carry his burden to show that race was the real reason for the strike, and the Government's stated reason was pretextual. (JA 128-131)

## ANALYSIS

Racial discrimination in jury selection violates the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, L. Ed. 2d 69 (1986). Constitutional error occurs if even a single juror is struck for racial reasons. *Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). When a *Batson* motion is made, the defendant must first make a "*prima facie*" showing of purposeful discrimination. *United States v. Malindez*, 962 F.2d 332 (4th Cir. 1992). In the instant case, the court presumed Appellant had made a *prima facie* showing where the government exercised its challenges to exclude two-thirds of the potential African American jurors presented to it in the initial panel. Once a defendant establishes a *prima facie* case of discrimination, the burden shifts to the prosecutor to articulate a race neutral explanation for the challenge. *United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998). Here, the prosecutor's stated reason for excusing jurors Ingram and Riddle was that they had answered yes to Question No. 4 on their written questionnaires but did not respond in open court when asked the exact same question orally. Once the prosecutors put forward race neutral explanations for the challenge, the burden shifts back to

defendant to prove that the explanation given is pretext for discrimination. *Howard v. Moore*, 131 F.3d 399 (4th Cir. 1997) (*en banc).*

Appellant contends the government's stated reasons were pretextual and the strikes were motivated by race. First, there is evidence of the prosecutor's disparate questioning of black and white prospective jurors. *Flowers v. Mississippi*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019) Next, a side-by-side comparison of black prospective jurors who were struck with white prospective jurors who were not struck, support the Appellant's claim. *Id.* Finally, asking jurors in oral form, the same question that they had already answered in written form amounts to what the Supreme Court called trickery in *Miller-EL v. Dretke,* 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

## Evidence of the Prosecutor's Disparate Questioning of Black and White Prospective Jurors

In the second panel called to the box, the court examined jurors Brent Mitchell, Tina Spach, Paul Rice, Henry Christian, Wayne Daniels, Jonathan Clegg and Lynda Hunter. (JA 141) Jurors Henry Christian and Jonathan Clegg self-identified as black. (JA 1559) The other jurors self-identified as white. (JA 1559) After the court's questioning, the court called the attorneys to the bench and asked for follow-up questions. Once again, the government asked the court to ask Question 4 from the questionnaire to the prospective jurors. (JA 162) Defense counsel noted that for this group of jurors, none of the jurors had answered

Question 4 in the affirmative. (JA 163) Nevertheless, the government wanted Question 4 asked again. (JA 163)

The next set of jurors called to the jury box included Karen Smith, Maxwell Kiser, Courtney Alderman and John Roberts. JA 167) All of these jurors self-identified as white. (JA 1559). On this pass, the Government did not request Question 4 from the questionnaire be asked of the jurors. (JA 147)

In the next panel, the parties were called upon to consider jurors Lori White and David Saunders. (JA 178) Lori White self-identified as white. David Saunders self-identified as "mixed." (JA 1559-60) No other explanation of "mixed" is provided. Again, the government did not ask for Question 4 to be asked of these jurors. (JA 185)

At this point, the parties were down to filling the final seat in the jury of twelve. Michael Boston was next called to fill that seat. (JA 187) He self-identified as black. (JA 1560) The government did not request Question 4 to be asked of Mr. Boston. (JA 190) However, Boston indicated during his questioning that he was the owner of a restaurant that had been burglarized six times and as result of that, he expressed "I don't think I could be fair." (JA 190) He was ultimately excused for cause. (JA 191)

Four more jurors were then called in succession, in an attempt to fill the final seat in the initial panel of 12. The first three were Stanley Carlton, Stephen Sutton

and John Dixon. (JA 191, 194, 197) All self-identified as white (JA 1560) The government did not request that Question 4 be re-asked of any of these three jurors. (JA 194, 196, 200). All three were excused by use of peremptory challenges.

Cherie Thomas was then called to the final juror seat. Ms. Thomas self-identified as black. (JA 1560). When asked by the court if there were any follow-up questions, the Government then asked that Question 4 be asked of juror Thomas (JA 239).

The Court then proceeded to select alternate jurors. The following jurors were called to the box all at one time: Amy Wyscarver, Cheryl Fraizer, Cynthia Whitten, Candy Slade, Jessica McLaughin, Kelley Keats, Hanchy Lusk, Christine Smith, Nicholas Schmid, Jennifer LaClaire, William Price and Bobbe McKinney. (JA 241-2) Of those jurors, Candy Slade identified as black and Hanchy Lusk identified as asian. (JA 1560) The remainder of the identified jurors self-identified as white (JA 1560). For this group, the government asked the court to re-ask Question 4 from the questionnaire. (JA 267) Jury selection concluded with the selection of alternate jurors.

From this, it can be observed that the government did not consistently ask the court, as a follow-up question, to re-ask Question 4 from the questionnaire. With the exception of juror Michael Boston, who had indicated that he could not be fair, and was excused for cause, the government only asked to have the court re-

ask Question 4 when there was a black juror in the prospective panel. In all circumstances, when the government was choosing from panels that did not include a black juror, the government did not ask the court to re-ask Question No. 4.

The United States Supreme Court has found that evidence of a prosecutor's disparate questioning of black and white prospective jurors can support a claim that a prosecutor's peremptory strikes were made on the basis of race. *Flowers v. Mississippi*, *supra*. This is exactly what Appellant presents in this case. The government's purported race neutral explanation for its peremptory strikes was linked to its requesting the court to re-ask Question 4 from the jury questionnaire. However, with one exception, the government never made that request unless there was a black juror in the panel of prospective jurors. This indicates racial discrimination.

**Side-By-Side Comparisons of Black Prospective Jurors Who Were Struck and White Prospective Jurors Who Were Not Struck in the Case.**

The government's stated reason for striking juror Ingram and Riddle was based on their failure to respond to the oral asking of Question 4 from the questionnaire when they had answered the question affirmatively in written form. However, there was a white juror, who also answered Question 4 in the affirmative in written form yet failed to respond to the court's oral inquiry. During the examination of the first twelve jurors, one of the jurors called to the box was

Linwood Brandis. (JA 59). Brandis self-identified as white. (JA 1559) On Brandis's questionnaire, he answered Question 4 in the affirmative. (JA 1567-8) At no time during the court's re-asking of Question 4, in any form, did juror Brandis raise his hand and respond in the affirmative. (JA 97-100, 111-112) Accordingly, Linwood Barnes satisfied the exact same criteria for which the government purportedly excused jurors Riddle and Ingram. However, the government did not exercise a peremptory challenge toward Linwood Brandis, who was white. (JA 116)

The Supreme Court expressly stated in *Flowers v. Mississippi*, *supra*, that a side-by-side comparison of black prospective jurors who were struck with white prospective jurors were not struck in the case, is evidence to support a claim that the prosecutor's peremptory strikes were made on the basis of race. This is exactly what happened in this case. The stated reason why the government struck jurors Ingram and Riddle is equally applicable to Linwood Brandis. However, he was not struck. The distinguishing feature between the three is that Ingram and Riddle were black and Brandis was white. Accordingly, this criteria for evaluating a *Batson* claim as recognized the United States Supreme Court supports Appellant's claim that the prosecutor's peremptory strikes were made on the basis of race. *Mississippi v. Flowers*, *supra*.

## Trickery

In *Miller-El v. Dretke*, *supra*, the Supreme Court identified another kind of disparate questioning which it called "trickery." *Id at* 259, 2336, 225. The prosecutors were asking jurors about what they consider to be a minimum sentence that they would impose for murder. While Texas had a mandatory minimum of five years, only some of the jurors were informed of that before they were asked the question about what they would impose as a minimum sentence for murder. In *Miller-EL*, the court noted that 94% of whites were informed of the statutory minimum sentence compared with only 12 ½% of African Americans. The court ultimately described this as "a trick question*." Id*. By not informing some jurors of the mandatory minimum sentence and informing others, it necessarily affected the outcome of their answers. The fact that the questions were asked in such a manner that correlated with race, ultimately allowed the court to find that as evidence of racial motivation.

While the inconsistent use of Question 4 has already been noted, the fact that the question being asked had already been asked previously, suggests that it was not being asked as part of an information gathering process. Instead, the reason was to offer a potential trap for certain jurors. Juror Riddle had indicated on her form that she would be embarrassed to discuss the information she provided on her questionnaire to Question 4 in open court. Nevertheless, her failure to respond was

found by the court to be a valid basis for her excusal. The fact that this question was asked almost exclusively when black jurors were present in the prospective panel, suggests that the true reason for re-asking the same question again was not to determine any candor or for leading to follow-up questions, but to provide a basis for race neutral exclusion of a juror. This amounts to what the Supreme Court has called trickery. *Miller-El v. Dretke*, *supra*.

It is not necessary to determine that any one of these factors alone would require reversal. All that is needed, is that based on all of the relevant facts and circumstances, taken together establish that the government's peremptory strikes of jurors Ingram and Riddle were motivated in substantial part by discriminatory intent. *Batson*, *supra*. Appellant has demonstrated sufficient evidence to support that conclusion and accordingly, Appellant's convictions mut be reversed in the matter remanded for new trial.

IV.    THE COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW BY SUSTAINING THE GOVERNMENT'S OBJECTION TO DEFENSE COUNSEL'S ARGUMENT REGARDING REASONABLE DOUBT.

A.    **STANDARD OF REVIEW**

The court reviews legal issues, including claims of due process violations, de novo. *De Belbruno v. Ashcroft*, 362 F.3d 272 (4th Cir. 2004).

**B.    DISCUSSION OF THE ISSUE**

During closing argument, defense counsel was making an analogy to the jury regarding a hypothetical situation in which he attempted to convey the concept of proof beyond a reasonable doubt.  The government objected and the court ultimately sustained the objection.  Defense counsel's argument was proper in law under United States Supreme Court decisions and the courts' actions conveyed to the jury that the standard of proof in this case was less than actual proof beyond a reasonable doubt.  This violates Appellant's right to due process of law.  *In re Winship*, 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

**FACTS**

In his closing argument, defense counsel argued that while the government had proved Appellant's vehicle was involved in the attempted robbery, the only evidence presented to show that Appellant was in the vehicle during the robbery was the testimony of one witness, Hykeem Cox. (JA 1341)  For a variety of reasons, counsel argued that Hykeem Cox was not a credible witness and that the government's case failed to constitute proof beyond a reasonable doubt of the Appellant's involvement in the crime itself, rather than just the cover-up.  Toward the end of his argument, defense counsel attempted to argue the credibility of Hykeem Cox in the context of proof beyond a reasonable doubt.  Counsel stated the following:

> Now, proof beyond a reasonable doubt is something that gets rid of any nagging concerns that you have. It's the kind of evidence that you're going to rely on and act on in important matters. I propose the following example for you.

(JA 1359).

Counsel then describes a hypothetical situation in which the prospective jurors are approached by a longtime friend who wants them to join in a business venture. The friend describes that he is already working with another person and they have what appears to be a "can't fail business plan." (JA 1359) The juror would have to make a substantial investment of money in the venture. In order to persuade the juror to invest, the friend proposes that they have a meeting where the prospective juror could meet the business partner. Counsel goes on to describe that when the meeting takes place, the business partner is revealed to be Hykeem Cox. Counsel was attempting to contextualize, believing Hykeem Cox's testimony, with proof beyond a reasonable doubt as to whether it is the kind of proof that you would rely and act upon in the most important of your own affairs by analogizing it to the proposed business deal. During counsel's argument, the following occurs:

> You show up for the meeting. Your buddy is there. He opens the door, he walks in, and his business partner is Hykeem Cox. Now, you're going to get in business with Hykeem Cox? You're going to believe anything? No, you're not. You're going to run screaming from them. And if you wouldn't trust him in a business deal, why would you trust his word in this case?

> **MR. GREEN:** Objection.

**THE COURT:** Step up here, please?

(JA 1360)

The Court then conducted a bench conference in which it discussed counsel's argument with the parties. During this bench conference, counsel informed the court that he was attempting to tailor his argument as an analogy with the definition of proof beyond a reasonable doubt:

> I would say, while it's not an instruction adopted in this circuit, that certainly many circuits have adopted the "rely and act upon without hesitation the most important of your own affairs," and so I don't think my analogy is wrong when it comes to the actual definition of proof beyond a reasonable doubt. But I have stayed away from actually using those terms because of how the Court has admonished us.

(JA 1361) At the conclusion of the bench conference, the court made the following statement to the jury:

> **THE COURT**: The Court is going to sustain the objection. Ladies and gentlemen, I'll instruct you as to the standard for reasonable doubt. Alright. You may proceed.

(JA 1363) Later, when the Court did address reasonable doubt to the jury, it stated the following:

> The Government has the burden of proving the Defendant guilty beyond a reasonable doubt; and if it fails to do so, you must acquit the Defendant. Thus, while the Government's burden of proof is a strict or heavy burden, it is not necessary that the govern -- that the Defendant's guilt be proved beyond all possible doubt. It is only required that the Government's proof exclude any reasonable doubt concerning the Defendant's guilt. A reasonable doubt may arise either from the evidence or from a lack of evidence.

(JA 1370)

# ANALYSIS

> The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of evidence – that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."

*In re Winship*, 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970) citing

*Coffin v. United States*, 156 U.S. 432 (1895). A defendant's right to trial by jury

necessitates that jurors understand and apply the reasonable-doubt standard fairly

and properly:

> Moreover, use of the reasonable-doubt standard is indispensable to command the respect and competence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be deluded by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper fact finder of his guilt with utmost certainty.

*In re Winship* at 364.

The United States Supreme Court has found that an improper instruction on

reasonable doubt violates the due process clause. *Cage v. Louisiana*, 498 U.S. 39,

111 S. Ct 328, 12 L. Ed. 2d 339 (1990) and *Sullivan v. Louisiana*, 508 U.S. 275,

113 S. Ct. 2078, 124 L. Ed. 2d. 182 (1993).

In the instant case, counsel was attempting to argue that the government had

not met its burden of proof beyond a reasonable doubt. Counsel was expressing

the high degree of proof required by making an analogy to a proposed real-life situation a juror would face that would equate with a well-known understanding of proof beyond a reasonable doubt. Counsel's argument is based on a definition of proof beyond a reasonable doubt that comes from the United States Supreme Court's decision in *Hopt v. Utah*, 120 U.S. 430 (1887). There, the Supreme Court provided the following definition of proof beyond a reasonable doubt:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and action thereon."

*Id. at 441.* This definition of proof beyond a reasonable doubt has been adopted by other Circuits as a pattern jury instruction. For example, the pattern jury instruction used in the Fifth Circuit states:

> "Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your own affairs".

*Fifth Circuit Pattern Jury Instructions, Criminal Cases 1.05, Presumption of Innocence, Burden of Proof, Reasonable Doubt.*

Accordingly, counsel's argument was correct in law. Counsel was simply attempting to make this argument while not running afoul of this court's longstanding rule that counsel should not attempt to define reasonable doubt. *United States v. Oriakhi*, 57 F..3d 1290 (4th Cir. 1995). Nevertheless, when the

court intervened and sustained the objection to counsel's argument, the court signaled to the jurors that counsel's argument was incorrect as a matter of law. This allowed the jury to believe that the definition of proof beyond a reasonable doubt was a lower standard than what counsel was arguing to the jury. Because the court never corrected this error in its instructions on reasonable doubt, the jury was left with the impression that the burden of proof that the government was required to carry in Appellant's case was lower than actual proof beyond a reasonable doubt. The court's action created a reasonable likelihood that a juror misapplied the concept of proof beyond a reasonable doubt which violates Appellant's constitutional right to due process of law. *Cage v. Louisiana*, *supra*; *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 3805 (1991). Accordingly, Appellant's conviction must be reversed and remanded for a new trial.

## CONCLUSION

For reasons stated in Argument I, Appellant requests this court to vacate his conviction on Count Three. For reasons stated in Argument II, Appellant request this court to vacate his convictions on Counts One, Two and Three. For reasons stated in Arguments III and IV, Appellant requests that this court to reverse and remand for a new trial any counts not vacated.

Respectfully submitted, this the 13th day of June, 2022.

*/s/ John D. Bryson*
John D. Bryson
1912 Eastchester Drive, Suite 400
High Point, NC  27261
Telephone: (336) 819-6016
Facsimile: (336) 819-6076
Email:  jbryson@wehwlaw.com

*/s/ Mark P. Foster, Jr.*
Mark P. Foster, Jr.
409 East Blvd.
Charlotte, NC 28203
T:  980-721-5221
Email:  markpfosterjr@gmail.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.　This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

　　this document contains 8,919 words.

2.　This document complies with the typeface requirements because:

　　This document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

*/s/ John D. Bryson*
John D. Bryson
1912 Eastchester Drive, Suite 400
High Point, NC  27261
Telephone: (336) 819-6016
Facsimile: (336) 819-6076
Email:  jbryson@wehwlaw.com

*/s/ Mark P. Foster, Jr.*
Mark P. Foster, Jr.
409 East Blvd.
Charlotte, NC 28203
T:  980-721-5221
Email:  markpfosterjr@gmail.com

*Counsel for Appellant*