In the

# UNITED STATES COURT OF APPEALS

## For the Fourth Circuit

_____

No. 21-4458
_____

## UNITED STATES OF AMERICA,

Appellee,

v.

## MAURICE OWEN WILEY, JR.,

Appellant.

_____

On Appeal from the United States District Court
For the Middle District of North Carolina
_____

## <u>BRIEF FOR APPELLEE</u>

**SANDRA J. HAIRSTON**
**United States Attorney**

**Graham T. Green**
**Craig M. Principe**
**Assistant United States Attorneys**

**251 N. Main St., Ste. 726**
**Winston-Salem, NC 27101**
**(336) 333-5351**

**Attorneys for Appellee**
**Date: October 4, 2022**

# TABLE OF CONTENTS

BRIEF FOR APPELLEE ......................................................................... 1

STATEMENT OF JURISDICTION........................................................ 1

ISSUES PRESENTED ............................................................................. 2

I.     WHETHER COUNT THREE OF THE SUPERSEDING
       INDICTMENT WAS DEFECTIVE WHERE IT TRACKED THE
       LANGUAGE OF THE STATUTE, AND WHETHER THE
       DISTRICT COURT ERRED BY INSTRUCTING THE JURY ON
       THAT COUNT THAT A HOBBS ACT ROBBERY IS A "CRIME OF
       VIOLENCE?"................................................................................... 2

II.    WHETHER THERE WAS SUBSTANTIAL EVIDENCE
       PRODUCED AT TRIAL BY WHICH A RATIONAL JUROR
       COULD CONCLUDE THAT WILEY AND HIS
       COCONSPIRATORS AGREED TO COMMIT A ROBBERY OF
       CHINA WOK BY TARGETING THE PROCEEDS FROM THE
       BUSINESS AND SEPARATELY AGREED TO POSSESS
       FIREARMS TO COMMIT THE ROBBERY? ................................... 2

III.   WHETHER THE DISTRICT COURT CLEARLY ERRED IN
       RULING AGAINST WILEY'S *BATSON* CHALLENGE WHERE
       THE GOVERNMENT OFFERED A RACE-NEUTRAL REASON
       FOR STRIKING JURORS AND THE COURT FOUND THAT
       REASON CREDIBLE?..................................................................... 2

IV.    WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION
       BY FOLLOWING FOURTH CIRCUIT LAW REGARDING
       CLOSING ARGUMENTS THAT ATTEMPT TO DEFINE
       REASONABLE DOUBT?................................................................. 2

STATEMENT OF THE CASE ................................................................ 3

SUMMARY OF ARGUMENT ............................................................... 22

ARGUMENT ......................................................................................... 24

I.     COUNT THREE OF THE SUPERSEDING INDICTMENT WAS
       NOT DEFECTIVE WHERE IT TRACKED THE LANGUAGE OF
       THE SECTION 924(o) STATUTE, AND THE DISTRICT COURT
       DID NOT ERR BY INSTRUCTING THE JURY ON THAT COUNT

THAT A HOBBS ACT ROBBERY IS A "CRIME OF VIOLENCE." ............................................................................... 24

    A.    Standard of Review ............................................................ 24

    B.    Discussion ........................................................................ 25

II.    SUBSTANTIAL EVIDENCE WAS PRODUCED AT TRIAL THAT WILEY AND HIS COCONSPIRATORS AGREED TO COMMIT A ROBBERY OF CHINA WOK, ATTEMPTED THE ROBBERY BY TARGETING THE PROCEEDS FROM THE BUSINESS, AND SEPARATELY AGREED TO POSSESS FIREARMS TO COMMIT THE ROBBERY. ........................................................................ 33

    A.    Standard of Review ............................................................ 33

    B.    Discussion ........................................................................ 34

III.    THE DISTRICT COURT DID NOT CLEARLY ERR IN RULING AGAINST WILEY'S *BATSON* CHALLENGE WHERE THE GOVERNMENT OFFERED A RACE-NEUTRAL REASON FOR ITS STRIKES AND THE COURT FOUND THAT REASON CREDIBLE. ....................................................................... 46

    A.    Standard of Review ............................................................ 46

    B.    Discussion ........................................................................ 46

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FOLLOWING FOURTH CIRCUIT LAW REGARDING CLOSING ARGUMENTS THAT ATTEMPTED TO DEFINE REASONABLE DOUBT. ....................................................................... 56

    A.    Standard of Review ............................................................ 56

    B.    Discussion ........................................................................ 57

CONCLUSION .................................................................................. 65

CERTIFICATE OF COMPLIANCE ..................................................... 66

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Batson v. Kentucky,*
  476 U.S. 79 (1986) ............................................................ 55

*Flowers v. Mississippi,*
  139 S. Ct. 2228 (2019) ...................................................... 55

*Hernandez v. New York,*
  500 U.S. 352 (1991) ..................................................... 49, 50

*Herring v. New York,*
  422 U.S. 853 (1975) ............................................................ 60

*Iannelli v. United States,*
  420 U.S. 770 (1975) ............................................................ 28

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ............................................................ 37

*Jones v. Plaster,*
  57 F.3d 417 (4th Cir. 1995) .............................................. 55

*Matthews v. Evatt,*
  105 F.3d 907 (4th Cir. 1997) ............................................ 50

*Miller-El v. Dretke,*
  545 U.S. 231 (2005) ............................................. 50, 53, 54

*Snyder v. Louisiana,*
  552 U.S. 472 (2008) ............................................................ 50

*United States v. Banks,*
  10 F.3d 1044 (4th Cir.1993) ............................................. 35

*United States v. Barnette,*
  644 F.3d 192 (4th Cir. 2011) ....................................... 48, 53

*United States v. Berrios,*
  676 F.3d 118 (3d Cir. 2012) ......................................... 28, 31

*United States v. Buffey,*
  899 F.2d 1402 (4th Cir 1990) ...................................... 41, 44

*United States v. Burgos,*
  94 F.3d 849 (4th Cir. 1996) ...................................... passim

*United States v. Burks,*
  437 U.S. 1 (1978) .......................................................... 33, 34

*United States v. Bynum,*
  604 F.3d 161 (4th Cir. 2010) ............................................ 36

*United States v. Cobb,*
   905 F.2d 784 (4th Cir. 1990) ...................................................... 64

*United States v. Crockett,*
   813 F.2d 1310 (4th Cir. 1987) ....................................... 60, 61, 64

*United States v. Darby,*
   37 F.3d 1059 (4th Cir. 1994) ...................................................... 24

*United States v. Dinkins,*
   691 F.3d 358 (4th Cir. 2012) .............................................. 46, 48, 55

*United States v. Donahue,*
   607 F. App'x 233 (4th Cir. 2015) ............................................ 43

*United States v. Farrior,*
   535 F.3d 210 (4th Cir. 2008) ................................................ 46, 48

*United States v. Floresca,*
   38 F.3d 706 (4th Cir. 1994) ...................................................... 25

*United States v. Grandison,*
   885 F.2d 143 (4th Cir. 1989) ...................................................... 55

*United States v. Grimmond,*
   137 F.3d 823 (4th Cir. 1998) ...................................................... 49

*United States v. Hare,*
   820 F.3d 93 (4th Cir. 2016) ...................................................... 37

*United States v. Harris,*
   39 F.3d 1262 (4th Cir. 1994) ...................................................... 36

*United States v. Headspeth,*
   852 F.2d 753 (4th Cir. 1988) .......................................... passim

*United States v. Hedgepeth,*
   418 F.3d 411 (4th Cir. 2005) ...................................................... 34

*United States v. Hickman,*
   626 F.3d 756 (4th Cir. 2010) ...................................................... 36

*United States v. Isnadin,*
   742 F.3d 1278 (11th Cir. 2014) .............................................. 27

*United States v. Jenkins,*
   628 F. App'x 840 (4th Cir. 2015) ............................................ 27

*United States v. Joe,*
   982 F.2d 99 (1991) ...................................................... 55

*United States v. Johnson,*
   820 F. App'x 199 (4th Cir. 2020) ....................................... 28, 31, 38

*United States v. Khan,*
   309 F. Supp. 2d 789 (E.D. Va. 2004) ..................................... 27, 35

*United States v. Laughman*,
618 F.2d 1067 (4th Cir. 1980) ............................................. 35
*United States v. Leavis*,
853 F.2d 215 (4th Cir. 1988) ............................................... 33
*United States v. Mabry*,
953 F.2d 127 (4th Cir. 1991) ............................................... 35
*United States v. Malloy*,
568 F.3d 166 (4th Cir. 2009) ............................................... 25
*United States v. Manbeck*,
744 F.2d 360 (4th Cir. 1984) ............................................... 35
*United States v. Mathis*,
932 F.3d 242 (4th Cir. 2019) ......................................... 29, 32
*United States v. Matzkin*,
14 F.3d 1014 (4th Cir 1994) ............................................... 58
*United States v. McCaskill*,
676 F.2d 995 (4th Cir. 1982) ............................................... 58
*United States v. McLean*,
715 F.3d 129 (4th Cir. 2013) ......................................... 36, 37
*United States v. McMillon*,
14 F.3d 948 (4th Cir. 1994) ................................................. 49
*United States v. Mills*,
995 F.2d 480 (4th Cir. 1993) ............................................... 28
*United States v. Ocasio*,
750 F.3d 399 (4th Cir. 2014) ............................................... 35
*United States v. Olano*,
507 U.S. 725 (1993) .......................................................... 59
*United States v. Patterson*,
150 F.3d 382 (4th Cir. 1998) ......................................... 60, 64
*United States v. Perry*,
560 F.3d 246 (4th Cir. 2009) ......................................... 26, 31
*United States v. Powell*,
469 U.S. 57 (1984) ............................................................ 34
*United States v. Powell*,
693 F.3d 398 (3rd Cir. 2012) ............................................... 45
*United States v. Pratt*,
351 F.3d 131 (4th Cir. 2003) ............................................... 45
*United States v. Randall*,
171 F.3d 195 (4th Cir. 1999) ......................................... 26, 31

*United States v. Roberts,*
 262 F.3d 286 (4th Cir. 2001) .................................................. 36
*United States v. Robinson,*
 627 F.3d 941 (4th Cir. 2010) .................................................. 28
*United States v. Robinson,*
 744 F.3d 293 (4th Cir. 2014) .................................................. 57
*United States v. Simmons,*
 11 F.4th 239 (4th Cir. 2021) .............................................. 29, 30
*United States v. Smith,*
 441 F.3d 254 (4th Cir. 2006) ........................................ 61, 63, 64
*United States v. Spagnolo,*
 546 F.2d 1117 (4th Cir. 1976) ................................................ 44
*United States v. Strayhorn,*
 743 F.3d 917 (4th Cir. 2014) .................................................. 44
*United States v. Taylor,*
 142 S. Ct. 2015 (2022) .......................................................... 3
*United States v. Taylor,*
 754 F.3d 217 (4th Cir. 2014) .............................................. 42, 44
*United States v. Taylor,*
 979 F.3d 203 (4th Cir. 2020) ............................................... 3, 24
*United States v. Wang,*
 222 F.3d 234 (6th Cir. 2000) .................................................. 38
*United States v. Williams,*
 152 F.3d 294 (4th Cir. 1998) .............................................. 59, 60
*United States v. Williamson,*
 701 F. App'x 212 (4th Cir. 2017) ............................................ 37
*United States v. Young,*
 609 F.3d 348 (4th Cir. 2010) .................................................. 36
*Wilkins v. United States,*
 No. CR 16-10096-PBS, 2020 WL 533595 (D. Mass. Feb. 3, 2020) ...... 29

## Statutes

18 U.S.C. § 1951(a) ................................................................ 33
18 U.S.C. § 1959 .................................................................... 30
18 U.S.C. § 3231 ..................................................................... 2
18 U.S.C. § 3742 ..................................................................... 2
18 U.S.C. § 924(c) ........................................................ 26, 39, 40
18 U.S.C. § 924(o) ........................................................... passim

28 U.S.C. § 1291 ................................................................ 2

Va. Code §§ 18.2-53.1 and 18.2-282 ........................... 30

## **Rules**

Fed. R. Crim. P. 30 ........................................................ 58

In the

UNITED STATES COURT OF APPEALS

For the Fourth Circuit

_____

_____

No. 21-4458

_____

UNITED STATES OF AMERICA,

Appellee,

v.

MAURICE OWEN WILEY, JR.,

Appellant.

_____

On Appeal from the United States District Court
For the Middle District of North Carolina
_____

**BRIEF FOR APPELLEE**

**STATEMENT OF JURISDICTION**

This is a direct appeal by the defendant, Maurice Owen Wiley, Jr.

following a final judgment entered August 19, 2021 in the U.S. District

Court for the Middle District of North Carolina. JA 19, JA 1547-1554.

The district court had original jurisdiction over the case pursuant to 18 U.S.C. § 3231. Wiley timely filed his appeal on August 19, 2021. JA 19-20, JA 1555-1556. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

I. **WHETHER COUNT THREE OF THE SUPERSEDING INDICTMENT WAS DEFECTIVE WHERE IT TRACKED THE LANGUAGE OF THE STATUTE, AND WHETHER THE DISTRICT COURT ERRED BY INSTRUCTING THE JURY ON THAT COUNT THAT A HOBBS ACT ROBBERY IS A "CRIME OF VIOLENCE?"**

II. **WHETHER THERE WAS SUBSTANTIAL EVIDENCE PRODUCED AT TRIAL BY WHICH A RATIONAL JUROR COULD CONCLUDE THAT WILEY AND HIS COCONSPIRATORS AGREED TO COMMIT A ROBBERY OF CHINA WOK BY TARGETING THE PROCEEDS FROM THE BUSINESS AND SEPARATELY AGREED TO POSSESS FIREARMS TO COMMIT THE ROBBERY?**

III. **WHETHER THE DISTRICT COURT CLEARLY ERRED IN RULING AGAINST WILEY'S *BATSON* CHALLENGE WHERE THE GOVERNMENT OFFERED A RACE-NEUTRAL REASON FOR STRIKING JURORS AND THE COURT FOUND THAT REASON CREDIBLE?**

IV. **WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY FOLLOWING FOURTH CIRCUIT LAW REGARDING CLOSING ARGUMENTS THAT ATTEMPT TO DEFINE REASONABLE DOUBT?**

# STATEMENT OF THE CASE

## A. Procedural Background

Wiley was initially charged by criminal complaint. JA 3 (DE #1). An Indictment issued on October 1, 2019. JA 5 (DE #120). This case was later designated as a complex case. JA 6 (DE #154). In June of 2020, the district court set the matter for trial beginning January 19, 2021. JA 9 (DE #196).

On October 14, 2020, this Court entered judgment in *United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020) (holding attempted Hobbs Act robbery is not a crime of violence under 18 U.S.C. § 924(c)), which voided the legal basis for Counts Three and Four of the Indictment. An amended opinion issued, and this Court's mandate issued on December 21, 2020, approximately one month before Wiley's trial was scheduled to begin. *Taylor*, No. 19-7616 (4th Cir.), Doc. 63, 65.[1]

On January 4, 2021, the grand jury returned a Superseding Indictment charging Wiley. JA 25-29. After further motions to continue

---

[1] More than a year after the defendant's trial in April 2021, the Supreme Court affirmed the Fourth Circuit's decision in *Taylor*. *United States v. Taylor*, 142 S. Ct. 2015 (2022).

the trial and addressing other matters, the case was set for trial April 19, 2021. JA 11-13 (DE #237). Following a seven-day trial, the jury convicted Wiley on Counts One, Two and Three of the Superseding Indictment. JA 30-31, JA 1453-1454.

Wiley filed a motion for judgment of acquittal under Rule 29. JA 1455-1461. The Government filed a response. JA 1462-1473. The district court denied the motion and filed a memorandum order on June 7, 2021. JA 1474-1493.

A sentencing hearing was held on August 18, 2021. JA 1494-1546. Wiley was sentenced to 560 months of imprisonment, 3 years of supervised release, $300 in special assessments, and $71,800 in restitution. JA 1539-1540, JA 1547-1554. Wiley timely filed notice of appeal on August 19, 2021. JA 1555-1556.

## B.  **Factual Background**

H.Z. and his wife, W.P.C., co-owners of China Wok restaurant in Durham, North Carolina, returned home on the evening of April 15, 2018, during a heavy rainstorm. H.Z. was shot in the head during a botched attempted robbery and was killed in his driveway, in front of his family. Wiley was identified as a conspirator in the crimes and was linked to

those crimes by cellular phone records, vehicle Infotainment system records, forensic evidence, eyewitness testimony, business records, and his own admissions.

## W.P.C., H.Z., and their Business China Wok

W.P.C.[2] and H.Z. owned and operated China Wok, a Chinese food restaurant in a shopping center at 3825 South Roxboro Road in Durham, North Carolina. JA 326-327, JA 332-334. They worked together at the restaurant and on a typical day opened at 11:00 a.m. and closed at 11:00 p.m., except on Sundays, when they opened at 12:00 p.m. and closed around 10:00 or 10:30 p.m.  JA 333. They were open for business and worked at the restaurant together every day except Thanksgiving when they were closed. JA 333. This restaurant affected interstate and foreign commerce by selling food, providing takeout dining services, and buying food and products from out of state (including New York, Virginia, and Georgia) for use in the restaurant. JA 327-333.

In April 2018, W.P.C. and her family lived at 4617 Carlton Crossing Drive in Durham, which was "very close to the restaurant." JA 326, JA

---

[2] W.P.C. also goes by the nickname Shirley and is referred to throughout the testimony as both W.P.C. and Shirley by different witnesses.  JA 326.

333.[3] W.P.C. and her husband bought the home around the same time they opened China Wok in 2002. JA 332. When asked if W.P.C. and her husband H.Z. made it "a habit to bring home the proceeds of the business, the money that customers had paid you, and bring them to your house," W.P.C. answered, "Yes."[4] JA 335. When asked if she "had money from the business on this occasion, on April 15," W.P.C. said, "Yes." JA 335, JA 340 ("I carried the money home.").[5]

W.P.C. and H.Z. kept a gun at their home to defend themselves when returning home from China Wok, because of prior burglaries and robberies at their home. JA 336, JA 351.

### Attempted Robbery of China Wok's Proceeds

On April 15, 2018, W.P.C. and H.Z. left China Wok at 10:20 p.m. JA 335. They arrived home from China Wok two to three minutes later.

---

[3] The CAST Analysis report plotted the location of China Wok and 4617 Carlton Crossing Drive on a scaled map of Durham, North Carolina, showing their close proximity to one another. JA 1088; *see also* Govt. Exh. 352, p. 7.

[4] W.P.C. testified at trial with the assistance of a Mandarin interpreter. JA 286-287, JA 325-345.

[5] Detective Cramer later explained that W.P.C. told him four days after the robbery that she did not have any money with her. JA 935. E.Z. testified that his mother handed him a bag that contained food. JA 359.

JA 335. When W.P.C. and her husband left the restaurant on the night of April 15, 2018, it was raining very hard. JA 335. H.Z. remained in their van as W.P.C. got out and went to open the front door. JA 336-337. As her son, E.Z., handed her the gun and magazine, as was their routine, W.P.C. saw the expression on his face change. JA 336-337, JA 339, JA 351-355.

W.P.C. recalled seeing men running with guns and shooting. JA 337. They came from a white vehicle. JA 337, JA 414-415, JA 421. When W.P.C. saw four to five robbers shooting, she fell to the ground, struggled to get up, and tried to shoot her gun. JA 337. She pulled the trigger several times and it would not fire. JA 337. Eventually, she got it to fire, and shot at the robbers. JA 337-338. W.P.C. recalled seeing four or five robbers run back to the white van. JA 338. Investigators later determined W.P.C. had wounded several of the robbers.

She ran to the minivan where her husband was and saw a bullet hole in the window but could not open the door. JA 338. Her husband was not answering her. JA 338. Her neighbors came over to help them. JA 339, JA 404-405. One performed CPR on H.Z. JA 339, JA 380, JA 404-405, JA 428. W.P.C. held her husband's hand and watched him die. JA

339. H.Z. was killed by a gunshot wound to the head. JA 770. A bullet core tore his cervical spine and spinal cord. JA 772. The core and a bullet jacket were collected and given to investigators. JA 774-778. As W.P.C. dealt with her grief over the death of her husband and business partner, China Wok remained closed for business for about a month. JA 340.

### **The Robbers Were Armed and Fired Four Handguns**

The attempted robbery occurred just before 10:27 p.m. JA 375-376, 379. David Cramer, a DPD homicide detective, arrived at Carlton Crossing Drive at 11:00 p.m. JA 918. DPD Crime Scene Investigators (CSIs) also responded to the scene. They testified in detail about the evidence collected in the investigation and described processing the crime scene, including collecting multiple 9mm caliber, .40 caliber, and .45 caliber shell casings from in front of the home. JA 490-496 (Govt. Exh. 78-216)[6], JA 605-727.

Allyson Anderson, an expert in firearm and toolmark analysis with DPD, performed two examinations as part of the investigation: a caliber determination on the bullet recovered from H.Z. during the autopsy and

---

[6] References to "Govt. Exh." is intended as an aid in following the testimony in the JA).

a toolmark examination of cartridge cases, projectiles, and a firearm from the Carlton Crossing crime scene. JA 803-809. Anderson determined that the bullet core and jacket were from a bullet that was either .40 Smith & Wesson caliber or a 10mm caliber ammunition. JA 829-36; JA 844-848.

Anderson analyzed five .40 Smith & Wesson caliber fired cartridge cases, two .45 Auto caliber fired cartridge cases, three 9mm caliber *unfired* cartridge cases, and twenty 9mm caliber fired cartridge cases collected from Carlton Crossing Drive, as well as several bullets or bullet fragments, and a test-fired casing from W.P.C.'s 9mm handgun. JA 856-881 (Govt. Exh. 304, pp. 5-10). Anderson determined that the five .40 Smith & Wesson caliber casings were fired from the same firearm (referred to as the G2 firearm). JA 876 (Items 22-26), JA 878. She determined that the two .45 caliber casings were fired from the same firearm (referred to as the G3 firearm). JA 876 (Items 27-28), JA 878. She also determined that the fired 9mm casings were fired by three different firearms (referred to as the G1, G4, and G5 firearms). JA 874-878. She determined that five of the fired 9mm casings were fired by the same firearm, the G4 firearm. JA 874 (Items 5, 12, 32-24), JA 878. She determined that one of the fired 9mm casings was fired by a distinct

firearm, the G5 firearm. JA 874 (Item 6), JA 878. Lastly, she determined that fourteen of the fired 9mm casings were fired by a distinct firearm, W.P.C.'s 9mm pistol, the G1 firearm. JA 874-875 (Items 7-11, 13-21), JA 878.

Using this analysis, a diagram of shell casings collected from Carlton Crossing Drive was color coded to reflect shell casings fired by the five distinct handguns, including the G1 firearm used by W.P.C. to defend herself:



JA 878-881 (Govt. Exh. 289).

## Police Find the Robbers' White Vehicle

Surveillance video from outside China Wok showed investigators that the white vehicle used in the attempted robbery at Carlton Crossing was seen earlier in front of the business at closing time on April 15, 2018. It also left the parking lot just before H.Z. and W.P.C. drove home in their minivan. JA 922-925 (Govt. Exh. 26 (surveillance videos)). Investigators then began a search for the white vehicle. JA 924-925.

Investigators discovered that the morning after the attempted robbery, a deputy with the Durham County Sheriff's Office had encountered a white Lincoln MKX with apparent exterior bullet damage and broken glass in the parking lot of Chapel Tower Apartments in Durham. JA 447-448, JA 925. The deputy responded to a report of property damage by Taquila House. JA 448-449. There was documented bullet damage to the Lincoln MKX less than 12 hours after the attempted robbery at Carlton Crossing Drive. JA 449-451 (Govt. Exh. 32 – Video), JA 451-453 (Govt. Exh. 33-35 – Still Images).

Taquila House lived at Chapel Towers Apartments and said she rented cars for Wiley and his girlfriend at AVIS in Durham. JA 534. House said that before April 15, 2018, she rented a red Ford Explorer on

April 13, 2018 for Wiley and gave it to him. JA 535-536, JA 541. Significantly, a red Ford Explorer was viewed on surveillance video outside China Wok on April 13, 2018. JA 436-445, JA 963 (Govt. Exh. 26, 30-31). The next day, the red Ford Explorer was exchanged for the white Lincoln MKX at the AVIS Budget store. JA 510-512, JA 526-528.

Wiley drove the white Lincoln MXK to House the night of April 15. JA 538. Wiley told her that "he was somewhere and somebody was shooting and the car got hit; we were going to try to get away." JA 537. Wiley also told House to "get a police report." JA 538. She did the following morning. JA 538. House discussed with Wiley the need to get the car fixed and Wiley told her, "I handled it. I'll get it fixed." JA 544.

Detective Cramer described later interviewing House at her workplace when Wiley called her. JA 928-929. The telephone conversation was audio recorded. JA 929. Wiley told Detective Cramer that he had the vehicle with him, that he had just gotten it repaired and was on his way back to Durham to return the vehicle. JA 929-931 (Govt. Exh. 311A).

## The Lincoln MKX Was Returned to AVIS

A DPD detective went to AVIS on Guess Road at Northgate Mall in Durham on April 19, 2018. JA 454. He noted the rear driver's side door of the Lincoln MKX was a different color than the rest of the vehicle and the window was halfway down. JA 457, JA 557. DPD Crime Scene Investigators testified about the processing and collection of evidence from that vehicle. JA 550-575, JA 695-710. The discolored rear door panel was disassembled revealing apparent bullet holes and damage to it. JA 566-573 (Govt. Exh. 49-50, 63-71). Glass fragments and DNA swabs of suspected blood were collected from the interior of the vehicle. JA 551-566. Glass fragments from the roadway at Carlton Crossing Drive and those collected from the vehicle were forensically examined and determined to be "consistent in physical properties, refractive index, and elemental composition" and "could have shared a common origin." JA 789.

Investigators discovered that the Lincoln MKX was equipped with an Infotainment system. JA 1220. That system accurately recorded multiple kinds of data points, including vehicle GPS location, speed, gear shift events, door events, and identifying information for electronic

devices connected to the vehicle entertainment system. JA 1154-1159, JA 1219-1223. Investigators used the information to determine the exact location of the Lincoln MKX between April 14 and April 16, 2018. JA 1255-1275, JA 1275-1279 (Govt. Exh. 372). Wiley's cell phone was connected to the Infotainment system at the time of the attempted robbery and murder on April 15, 2018 and the driver's side door opened as the vehicle was located directly in front of 4617 Carlton Crossing Drive. JA 1231-1245 (Govt. Exh. 361F (gear shift events), 361G (door events), 361H (device paired events), 361I (hard acceleration event), 361J (GPS location events), 364, 365).

## A 911 Call from Driver Street

Investigators determined that shortly after the attempted robbery at Carlton Crossing Drive, Darryl Bradford, Jr. was suffering from a gunshot wound and was located on North Driver Street also in Durham. A DPD officer responded to North Driver Street around 10:46 in the evening, encountered Bradford, and saw "he was shot in the back." JA 906, JA 910. Charles Daniels was with Bradford. JA 910.

## A Suspect Was Questioned About the Murder

Hykeem Deshun Cox was on state probation at the time of the attempted robbery and murder. JA 892. His probation officer observed an apparent gunshot wound to Cox's wrist and reported this information to an investigator. JA 892-894 (Govt. Exh. 315). Investigators decided to interview Cox, who implicated himself and several coconspirators in the attempted robbery and murder in a series of interviews. JA 960, JA 1132, JA 1147, JA 1346. Cox testified against Wiley. JA 1108-1149.

Investigators established phone numbers associated with each conspirator Cox identified. *See* JA 1006-1007 (Govt. Exh. 328). Investigators built a timeline using compiled records that showed numerous communications among the conspirators between April 13 and April 15, 2018. JA 1011-1013 (Govt. Exh. 329).

Among the items seized and searched were two cell phones belonging to Wiley. JA 1001-1004. One of those cell phones was linked to the Infotainment system of the same Lincoln MKX that was rented by Wiley and recovered at AVIS. JA 1226-1230 (Govt. Exh. 361B (Z982 device)). Wiley's cell phone (ZTE Model Z982 device) was connected to the

Infotainment system on April 14 and April 15, including during the time of the robbery. JA 1256-1258 (Govt. Exh. 371A).

### Cox Told Jurors that the Conspiracy to Rob China Wok Played Out Over Several Days

Cox said that prior to April 2018, he was unemployed and that he, Semaj Bradley, Darryl Bradford, and "Murda" (Charles Daniels), robbed businesses for money. JA 1110. Cox explained that he heard "on the street" that the owners of the China Wok "have a lot of money." JA 1110. Cox said he and the others agreed to rob the China Wok. JA 1110. The decision was made in part because "they are Asian and don't believe in banks." JA 1111. Further, Cox explained they targeted Asians "because they have a lot of money in their house." JA 1111.

Cox said that he, Bradford, Bradley, Daniels, and Wiley ("Tweet"), were involved in the agreement to rob the China Wok. JA 1111. Cox identified Maurice Owen Wiley, Jr. in the courtroom as Wiley, aka "Tweet." JA 1111. Cox said the coconspirators, including Wiley, discussed robbing the China Wok and formulated a plan to do so, while at his house or at Daniels's house. JA 1111. The initial plan was to lay in the bushes in the yard. JA 1112.

Cox explained that on April 13, 2018, he, Wiley, and the other coconspirators went to the China Wok in a red vehicle. JA 1113. He identified the red Ford Explorer on surveillance video. JA 1113-1114 (Govt. Exh. 26, 31). Historical cell phone data acquired by investigators and analyzed by the FBI (CAST analysis) confirmed the presence of several cell phones belonging to Wiley, Bradford, Cox, and Daniels in the vicinity of the China Wok. JA 1072-1107 (Govt. Exh. 352). Cox said that everyone had guns, because they were going to commit a robbery and that was part of their express agreement. JA 1114. Cox indicated that Wiley was driving them on April 13, 2018, but the robbery attempt was aborted. JA 1115. Likewise, cellular CAST analysis showed the phones in the vicinity of Carlton Crossing on the 13th. JA 1072-1107 (Govt. Exh. 352). Following the aborted attempt, the coconspirators returned to Charles Daniels's house, where the coconspirators, including Wiley, discussed next steps. JA 1116.

Cox explained that on April 14, 2018, the coconspirators went back to China Wok and Carlton Crossing Drive, this time in the white Lincoln, but did not attempt the robbery again that night. JA 1116-1117. CAST analysis placed coconspirator cell phones near both locations. JA 1072-

1107 (Govt. Exh. 352). GPS data from the Infotainment system confirmed the presence of that vehicle at both locations. JA 1256-1265 (Govt. Exh. 371C).

On April 15, 2018, the same coconspirators, including Wiley, met again on Driver Street. JA 1117. This time, a juvenile, I.T., was with them. JA 1117. Cox testified that Wiley arrived in a white car, which he subsequently identified as a white Lincoln. JA 1117-1118 (corroborated by GPS data, Govt. Exh. 371A, p.1).

Cox identified the white Lincoln on surveillance video from April 15 in front of the China Wok as the vehicle he and the other coconspirators occupied at that time, and that Wiley was driving. JA 1118 (Govt. Exh. 26). There were no mappable cellular location events for coconspirator cell phones on that date during the attempted robbery until Wiley placed a call just after the aborted attempt at 10:25 p.m. south of Carlton Crossing Drive. JA 1267 (Govt. Exh. 352, 371D).

Cox testified that all the coconspirators, including Wiley, were armed during the attempted robbery. JA 1119. Cox's social media records showed that from April 6 to April 19, 2018, he possessed and attempted to sell four handguns. JA 1032-1036 (Govt. Exh. 332-337). Notably, these

were of the same calibers as firearm casings recovered at location of the attempted robbery. JA 1034. When asked, "Why did you have guns?" Cox answered that everybody was armed because "we're about to rob the owners of China Wok" of their money. JA 1118. Cox explained that the money they were seeking came from "their business." JA 1119.

Cox said he provided a firearm to "Murda" (Charles Daniels) before the robbery attempt because Daniels did not have one. JA 1119. Cox explained it was necessary to make sure everyone was armed with a firearm, "Because we fixing to go rob somebody." JA 1119. Cox said that they left the China Wok parking lot and went to the business owners' home to wait for them. JA 1119. Infotainment system GPS data confirmed Cox's account. JA 1242-1243, JA 1256-1257, JA 1265-1273 (Govt. Exh. 364-365, 367, 371A, 372).

Cox explained that when they saw the owners' minivan approaching, Wiley said, "Headlights coming. Get on point." JA 1119-1120. Cox understood this to mean, "it's time to do this robbery." JA 1120. Cox described that the China Wok owners pulled into their driveway and the coconspirators saw the lady exiting their minivan with "a moneybag." JA 1120. Cox described all of the coconspirators, including Wiley, getting

out of the white Lincoln. JA 1120. The Infotainment system data recorded that Wiley's driver's side door opened. JA 1234-1235, JA 1256 (Govt. Exh. 361G, 371A p. 6). Cox said that "they" told her, "Give it up," which he understood meant the money from their business. JA 1120.

Cox described the subsequent firefight where "everybody" started firing. JA 1120. Cox said that he, Wiley, Bradford, and Bradley were shooting their guns. JA 1121. Cox admitted that he fired the fatal shot that killed H.Z. JA 1121. He could not account for where Charles Daniels or the juvenile were at that point. JA 1121.

Cox explained that he and other conspirators were injured. Cox said he was shot in the wrist. JA 1121. He was injured in the wrist. JA 892-894 (Govt. Exh. 315). Cox said Bradford ("Stretch") was shot in the back. JA 1121. Bradford was shot in the back, JA 910 (Govt. Exh. 314), and his blood and DNA were found by investigators in the Lincoln MKX. JA 1204-1205, JA 1211-1213. Cox said Bradley told them he was grazed over the eye. JA 1121. Six weeks later, Bradley had a scar beneath his left eye on his cheek. JA 914-916. Bradley also left blood and his DNA in the Lincoln MKX. JA 1212.

Cox testified that all of the coconspirators escaped in the Lincoln but that it was damaged by gunfire. JA 1121. GPS data from the Infotainment system showed that the Lincoln fled the scene stopping first at Driver Street. JA 1266-1267 (Govt. Exh. 371D). GPS data showed the Lincoln then went to Wiley's parents' house. JA 1245-1246 (Govt. Exh. 366 & 371A, p. 3). Subsequently, GPS data from the Lincoln and apartment complex surveillance footage placed the Lincoln near Taquila House's apartment at Chapel Towers Apartments. JA 594-595 (Govt. Exh. 74, 77), JA 1258-1259 (Govt. Exh. 371B).

## Wiley Played a Prominent Role in Facilitating the Conspiracy and Attempting to Cover Up the Crimes

Wiley, with Taquila House's help, rented two vehicles used to conduct surveillance of China Wok and the owner's home. AVIS rental agreement records showed that House was originally given a red Ford Explorer on April 13, 2018. JA 501, JA 506, JA 510. The records showed that this vehicle was returned on April 14, 2018 at 12:18 p.m., and was exchanged for the white Lincoln MKX. JA 510-512.

An AVIS employee explained he knew Wiley and that Wiley rented cars from him on multiple occasions. JA 523. On April 13, 2018, House came into the store with Wiley and rented the red Ford Explorer. JA 525.

21

The next day Wiley brought in the red Ford Explorer and parked near the front of the store and exchange vehicles. JA 526. Wiley was identified on surveillance footage with the red Ford Explorer. JA 527-528 (Govt. Exh. 48). They were given a white Lincoln MKX. JA 528. Wiley later called the employee and said that "the car had been shot." JA 528.

Evidence showed that Wiley took the Lincoln MKX to have the shattered glass window in the rear driver's side door repaired at Auto Glass Now in Durham on April 16, 2018. JA 575-584, JA 584-590. Infotainment system GPS data from the Lincoln MKX also showed that the vehicle had been taken to the location of Amigos Auto Repair shop on Cheek Road in Durham. JA 1251 (Govt. Exh. 370).

## SUMMARY OF ARGUMENT

Count Three of the Superseding Indictment was not defective as it substantially tracked the language of the 18 U.S.C. § 924(o) statute. Furthermore, the indictment was not constructively amended by the district court when it instructed the jury that a Hobbs Act robbery is a "crime of violence."

The district court did not err when it denied the defendant's motion for judgment of acquittal, where there was substantial evidence from

which a rational juror could find that Wiley, along with his coconspirators, reached an agreement to target the proceeds of China Wok, a business engaged in interstate commerce, and reached an agreement to possess firearms in furtherance of this "crime of violence"— a *completed* Hobbs Act robbery.

Wiley's argument that the district court erred with regard to his *Batson* challenge is without merit, as the challenged jurors failed to fully disclose in court relevant information that they had previously listed on juror questionnaires administered by the district court. Where the defendant acknowledged that the Government's reason was a "race neutral" reason, the district court did not err in finding that the Government's reason was not pretextual and the Government had credibly asserted a valid reason for the strikes.

The trial court properly sustained the Government's objection to defense counsel's attempt to define reasonable doubt in its closing argument through the use of a confusing analogy regarding a business transaction. Furthermore, Wiley agreed with the district court's instruction on reasonable doubt and did not request the expanded

language from the Fifth Circuit, which he now argues the court erroneously excluded.

## ARGUMENT

**I. COUNT THREE OF THE SUPERSEDING INDICTMENT WAS NOT DEFECTIVE WHERE IT TRACKED THE LANGUAGE OF THE SECTION 924(o) STATUTE, AND THE DISTRICT COURT DID NOT ERR BY INSTRUCTING THE JURY ON THAT COUNT THAT A HOBBS ACT ROBBERY IS A "CRIME OF VIOLENCE."**

### A. Standard of Review

First, Wiley argues that the trial court erred in denying his motion to dismiss Count Three of the Superseding Indictment, which charges a violation of 18 U.S.C. § 924(o), conspiracy to possess firearms in furtherance of a crime of violence, occurring on or about April 13, 2018 continuing up to and including on or about April 15, 2018. Def. Br. at 6. He argues that "Count Three alleges as its underlying crime of violence 'an offense under subsection (c) of Title 18, United States Code, Section 924," and therefore is defective in light of *United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020). Wiley's argument fails. "Whether an indictment properly charges an offense is a matter of law which we may consider *de novo* if the defendant makes a timely objection to the indictment." *United States v. Darby*, 37 F.3d 1059, 1062 (4th Cir. 1994).

Second, Wiley argues the district court improperly constructively amended Count Three by instructing the jury that a Hobbs Act robbery is a crime of violence. Def. Br. at 11-12. "A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994). This Court reviews *de novo* a claim of constructive amendment to an indictment. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009).

B.  Discussion

**1. Count Three of the Indictment was not defective.**

Count Three of the Superseding Indictment directly tracks the language of 18 U.S.C. § 924(o), which provides:

> A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

18 U.S.C. § 924(o). Thus, § 924(o) prohibits conspiring to commit an offense under § 924(c), which in turn prohibits, as relevant here, the

possession of firearms in furtherance of a "crime of violence." In other words, § 924(o) criminalizes conspiring to violate § 924(c).

Section 924(c) punishes "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c).

Moreover, as case law interpreting § 924(c) makes clear, the Government is not required to specify in an indictment which crime is the predicate crime, or even to charge a defendant with that crime. *See United States v. Randall*, 171 F.3d 195, 205 (4th Cir. 1999) ("[T]he government is under no obligation to specify a specific predicate offense in a § 924(c) charge."); *United States v. Perry*, 560 F.3d 246, 256 n.3 (4th Cir. 2009) (regarding a § 924(c) offense, "[w]e held that the government does not have to specify a predicate offense, but if it does, it must prove the predicate offense"). So, the fact that Count Three of Wiley's Superseding Indictment does not allege specifically the crime of violence is not fatal.

Count Three alleges in relevant part that Wiley and others "did unlawfully and knowingly combine, conspire, confederate, and agree with each other and other persons, known and unknown to the Grand Jurors, to possess firearms in furtherance of a crime of violence, to wit: an offense under Subsection (c) of Title 18, United States Code, Section 924; in violation of Title 18, United States Code, Section 924(o)." JA 27.

The elements of § 924(o) are: "1) a conspiracy, 2) to knowingly use, carry, possess, or discharge firearms, 3) in furtherance of a crime of violence." *United States v. Khan*, 309 F. Supp. 2d 789, 823 (E.D. Va. 2004). "To prove a violation of 18 U.S.C. § 924(o) . . . the Government must show: '(1) a conspiracy existed to commit the substantive offense; (2) [the defendant] knew of the conspiracy; and (3) [the defendant], with knowledge, voluntarily joined it.'" *United States v. Jenkins*, 628 F. App'x 840, 841 (4th Cir. 2015) (unpublished) (quoting *United States v. Isnadin*, 742 F.3d 1278, 1307 (11th Cir. 2014)). As with any other conspiracy charge, nothing in these elements requires the defendant to have completed the underlying substantive crime–here, possession of firearms in furtherance of a crime of violence. This recognizes the inchoate nature of a conspiracy charge that renders it legally distinct from a substantive

offense. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); *United States v. Mills*, 995 F.2d 480, 484 (4th Cir. 1993) ("[T]he focus of a conspiracy charge is the agreement to violate the law.").

Section 924(o) is a standalone offense, distinct from § 924(c), with a separate set of penalties. Section 924(c)(1)(A) criminalizes using, carrying, or possessing a firearm with the requisite connection to a crime of violence or drug trafficking crime, whereas § 924(o) separately criminalizes the conspiracy to do the same. While there is limited published Fourth Circuit authority on the scope of § 924(o), a successful conviction, consistent with the nature of conspiracy crimes, does not require the defendant to be convicted of, charged with, or even shown to have completed the predicate crime. *See United States v. Johnson*, 820 F. App'x 199, 204 (4th Cir. 2020) (unpublished) ("Firearms conspiracy 'requires proof of agreement,' not 'proof the substantive crime was actually committed.'") (citing *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010), and *Mills*, 995 F.2d at 484); *see also United States v.*

*Berrios*, 676 F.3d 118, 143 (3d Cir. 2012) ("[Section] 924(o) creates a conspiracy offense, which is by nature inchoate, and therefore *does not require* that the defendant actually commit the underlying crime."); *Wilkins v. United States*, No. CR 16-10096-PBS, 2020 WL 533595, at *5 (D. Mass. Feb. 3, 2020) (finding that defendant violated § 924(o) when he agreed to exchange drugs for a gun even though the transaction did not occur and he could not have violated § 924(c)). A defendant can be guilty of conspiring to possess firearms in furtherance of a *completed* Hobbs Act robbery in violation of § 924(o). *See United States v. Mathis*, 932 F.3d 242, 265-66 (4th Cir. 2019). A defendant may also be guilty of a subsequent attempted Hobbs Act robbery in violation of § 1951(a) when the object of the conspiracy was in fact attempted but frustrated. These two separate statutes criminalize two separate offenses—conspiracy to violate § 924(c) and attempted Hobbs Act robbery.

> **2. The Court did not constructively amend the indictment by instructing the jury that a Hobbs Act robbery is a "crime of violence."**

Wiley argues this Court's holding in *Simmons* supports his argument about constructive possession. Def. Br. at 10; *United States v. Simmons*, 11 F.4th 239, 268 (4th Cir.), *cert. denied*, 142 S. Ct. 574 (2021).

In *Simmons*, the defendants were charged, in relevant part, with multiple violations of the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959, with the VICAR counts being expressly predicated in the indictment on two Virginia state-law offenses: violations of Va. Code §§ 18.2-53.1 and 18.2-282. *Simmons*, 11 F.4th at 266-68. However, the jury instructions, while correctly referencing § 18.2-282, incorrectly referenced § 18.2-53—not § 18.2-53.1, as stated in the indictment. *Id.* This Court concluded, "By instructing on the broader section 18.2-53 unalleged predicate instead of the narrower section 18.2-53.1 alleged predicate, the district court's jury instructions broadened the possible basis for conviction on each of the VICAR Assault Counts." *Id.* at 267. This constituted a constructive amendment because the jury had a broader basis for conviction on the VICAR counts than the predicate offenses alleged in the indictment. *Id.* at 267-68.

Wiley contends *Simmons* reversed the defendant's convictions on several counts because the trial court instructed the jury on predicate offenses not alleged in the indictment, thereby constructively amending the indictment. Def. Br. at 11. The *Simmons* court reversed the convictions due to constructive amendment of the indictment in a case

where the Government expressly alleged predicate offenses in the indictment. Here, the Government alleged a violation of § 924(o) by tracking the statutory text, not by specifying a particular crime of violence, and was not required to do so. *See Randall*, 171 F.3d at 205; *Perry*, 560 F.3d at 256 n.3. Further, and consistent with the nature of conspiracy crimes, a successful § 924(o) conviction does not require the defendant to be convicted of or even be shown to have completed the predicate crime. *See Johnson*, 820 F. App'x at 204 ("Firearms conspiracy requires proof of agreement, not proof the substantive crime was actually committed.") (citations and quotations omitted); *Berrios*, 676 F.3d at 143 ("[Section] 924(o) creates a conspiracy offense, which is by nature inchoate, and therefore does not require that the defendant actually commit the underlying crime.").

In this case, the district court instructed the jury on the elements of a § 924(o) conviction, including the requirement that "two or more persons agreed to possess a firearm or firearms in furtherance of a crime of violence which may be prosecuted in federal court." JA 1389. The court further instructed the jury that a Hobbs Act robbery is a crime of violence. JA 1389. Wiley does not allege that instruction is incorrect as a matter of

law, nor can he—a completed Hobbs Act robbery is a crime of violence. *Mathis*, 932 F.3d at 265-66. Where the Government did not allege a predicate crime of violence in the Superseding Indictment, the district court's instruction cannot amount to a constructive amendment.

In sum, a *completed* Hobbs Act robbery—which is what was contemplated by Wiley and his coconspirators—is a crime of violence that can be prosecuted in federal court to support the § 924(o) charge. Based on the evidence presented, a rational juror could find beyond a reasonable doubt Wiley conspired with others to possess firearms in furtherance of a Hobbs Act robbery, a crime of violence, in violation of § 924(o), even if the coconspirators were unsuccessful in the robbery itself. Among other things, the Government presented evidence from codefendant Cox that all coconspirators were armed, which was corroborated by extensive ballistics evidence. JA 1118-1119, JA 878-881 (Govt. Exh. 289).

## II. SUBSTANTIAL EVIDENCE WAS PRODUCED AT TRIAL THAT WILEY AND HIS COCONSPIRATORS AGREED TO COMMIT A ROBBERY OF CHINA WOK, ATTEMPTED THE ROBBERY BY TARGETING THE PROCEEDS FROM THE BUSINESS, AND SEPARATELY AGREED TO POSSESS FIREARMS TO COMMIT THE ROBBERY.

### A.  Standard of Review

First, Wiley argues the district court erred by instructing the jury on two conspiracies. Def. Br. at 12. The Superseding Indictment charged Wiley in Count One with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and in Count Three with a conspiracy to possess firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(o). The district court instructed the jury on both offenses. JA 1381-1392. This Court will review for abuse of discretion whether the district court erred in instructing the jury on multiple conspiracies versus a single conspiracy. *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988).

Second, Wiley argues that the court erred in denying his motion for judgment of acquittal. Def. Br. at 16. In considering Wiley's argument, this Court "must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold it." *Burgos*, 94 F.3d at 862-63 (citing *United States v. Burks*, 437 U.S. 1, 17

(1978)). "Likewise, determinations of credibility are within the sole province of the jury and are not susceptible to judicial review." *Id.* (cleaned up). As this Court has stated, "the appellate function is not to determine whether the reviewing court is convinced of guilt beyond a reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, 'whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.'" *Burgos*, 94 F.3d at 863 (quoting *United States v. Powell*, 469 U.S. 57, 67 (1984)).

B. <u>Discussion</u>

**1. The evidence supported multiple conspiracies and the Court did not abuse its discretion in instructing the jury on both Counts One and Three.**

"As a general proposition, the elements of a conspiracy offense are: an agreement among the defendants to do something which the law prohibits; knowing and willing participation by the defendants in the agreement; and an overt act by the defendants in furtherance of the purpose of the agreement." *United States v. Hedgepeth*, 418 F.3d 411, 420 (4th Cir. 2005) (internal quotation marks omitted). However, neither conspiracy to commit Hobbs Act robbery, nor a § 924(o) conspiracy

require proof of an overt act. *United States v. Ocasio*, 750 F.3d 399, 409 n.12 (4th Cir. 2014); *United States v. Khan*, 309 F. Supp. 2d 789, 823 (4th Cir. 2004).

Circumstantial evidence may be used to prove the existence of a conspiracy. *United States v. Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996) (en banc). "[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence. It is not necessary to prove that the conspiracy has a discrete, identifiable organizational structure; the requisite agreement to act in concert need not result in any such formal structure, indeed frequently, in contemporary drug conspiracies, only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise exists." *United States v. Banks,* 10 F.3d 1044, 1046 (4th Cir.1993). As to the sufficiency of the evidence of the conspiracy counts, it is well established that a jury may consider both direct and circumstantial evidence to determine if there was a conspiracy. *United States v. Mabry*, 953 F.2d 127, 130 (4th Cir. 1991); *United States v. Manbeck*, 744 F.2d 360 (4th Cir. 1984); *United States v. Laughman*, 618 F.2d 1067, 1074-75 (4th Cir. 1980).

The question whether a defendant committed one conspiracy or multiple conspiracies is a question of fact for the jury to decide. *United States v. Roberts*, 262 F.3d 286, 294 (4th Cir. 2001)*; United States v. Harris*, 39 F.3d 1262, 1267 (4th Cir. 1994). In considering Wiley's argument, this Court must determine whether "the jury's verdict is supported by 'substantial evidence,' that is, 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilty beyond a reasonable doubt.'" *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). *See also United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (citing *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010)).

To determine whether a defendant meets the "heavy burden" provided under the rule, the question becomes whether "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *Hickman*, 626 F.3d at 763 (quoting *United States v. Bynum*, 604 F.3d 161, 166 (4th Cir. 2010) (internal quotation marks omitted)). This Court must "view [ ] the evidence in the light most favorable to the government," keeping in mind that "the jury ... weighs the credibility of

the evidence and resolves any conflicts in the evidence presented." *McLean*, 715 F.3d at 137 (quoting *Burgos*, 94 F.3d at 862). If multiple interpretations can be reasonably deduced from the evidence, "the jury decides which interpretation to believe." *Id.* (citing *Burgos*, 94 F.3d at 862). Reversal of a conviction is traditionally required when, regardless of proper jury instructions, "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979) (citations omitted).

Wiley argues there was insufficient evidence that there were two separate agreements—one agreement to commit the robbery and a separate agreement to possess firearms in furtherance of that robbery— and that there was in fact only a single agreement. Def. Br. at 12-16. The district court rejected this argument. JA 1491-1492. This Court has routinely affirmed convictions for both Hobbs Act conspiracy and Section 924(o) conspiracy that stem from a single transaction. *See, e.g., United States v. Hare*, 820 F.3d 93, 97 (4th Cir. 2016) (affirming Hobbs Act conspiracy and Section 924(o) charges when four defendants agreed to rob a drug house and planned to have firearms during the robbery); *United States v. Williamson*, 701 F. App'x 212, 214 (4th Cir. 2017)

(unpublished); *Johnson*, 820 F. App'x at 204. A Hobbs Act robbery conspiracy could involve weapons other than firearms, or no weapons at all. Whereas conspirators agree to commit robbery and agree to possess firearms during the robbery, such evidence is sufficient to sustain separate charges; the Section 924(o) conviction requires proof of the additional element regarding the firearms.

Viewing the evidence in this case in the light most favorable to the Government, a rational juror could find beyond a reasonable doubt, and the jurors in fact did so in this case, that the evidence presented was sufficient to support both conspiracies charged in Counts One and Three.

    **2. The conspiracy counts were supported by substantial evidence of a probable effect on interstate commerce and the attempted Hobbs Act robbery count was supported by substantial evidence that the robbers targeted the proceeds of a business engaged in interstate commerce.**

Wiley principally relies on *United States v. Wang,* 222 F.3d 234 (6th Cir. 2000), arguing that there was an insufficient showing of a "substantial connection" between the robbery and its effect on interstate commerce. Furthermore, Wiley argues that there was no evidence to support that the robbers targeted the China Wok "because their restaurant engaged in interstate commerce." Def. Br. at 17. There is no

such requirement under the law and Defendant's reliance on *Wang* is misplaced.

First, *Wang* is distinguishable from Wiley's case, and it is not controlling in the Fourth Circuit. *Wang* involved a conviction for a completed Hobbs Act robbery and an accompanying violation of 18 U.S.C. § 924(c). Wiley was convicted by a jury of conspiracy to commit a Hobbs Act robbery, conspiracy to use a firearm during a crime of violence, and an attempt to commit a Hobbs Act robbery. Thus, the crimes charged in *Wang* contained different elements than those offenses of which Wiley was convicted.

In this case, the jury heard from a cooperating defendant and Wiley's coconspirator, Cox, who testified that Wiley was a party to the agreement to rob the China Wok of its proceeds. There is substantial evidence that Wiley secured and drove the rental vehicles that were used by the coconspirators as they conducted surveillance on at least two occasions at China Wok and then at the victim's residence. Further, there is substantial evidence showing text message and call log toll record entries that demonstrate communications between the coconspirators during the period of the conspiracy. JA 988-1020 (Govt. Exh. 317A, 317B,

317C, 319 (Call Detail Records), 320-323, 328 (Summary Chart), 329 (Summary of Call Record Analysis)); JA 1026-1028 (Govt. Exh. 328-329).

A careful reading of the *Wang* opinion makes clear that the court was not drawing a bright line that a theft of business proceeds from a private residence can never satisfy the jurisdictional requirement for a Hobbs Act violation. The *Wang* court was persuaded that, because there was *no other evidence* beyond the loss of $1,200.00, the effect on interstate commerce of a robbery at a private residence did not satisfy the *de minimis* standard. The *Wang* court noted, "The Government made no showing of a substantial connection between the robbery and the restaurant's business, and the district court held that '[t]here is no evidence of an [e]ffect on interstate commerce.'" *Id*.

Here, the evidence at trial showed that the coconspirators agreed, and subsequently attempted, to target the proceeds of the China Wok restaurant by robbing its owners of those proceeds. Cox's testimony made clear that the agreement was centered around the belief that Chinese business owners kept the money from their business at their home. The surveillance on the nights prior to the robbery homicide, and on April 15, 2018, began at the China Wok, a business that was engaged in interstate

commerce. Further, Cox made clear through his testimony that it was the agreement of the conspirators to target the proceeds *of the business*. Unlike the robber in *Wang* who was waiting inside the victim's home, Wiley and his co-conspirators planned and agreed that they would rob the victims of those business proceeds prior to the victims actually getting inside their home. In fact, that is exactly what happened on the evening of April 15. The evidence showed that the conspirators did not leave the Lincoln MKX until they had seen what they believed to be a "money bag." JA 1120. Thus, a reasonable inference can be drawn that the targeting had nothing to do with personal assets or valuables that were inside the home at Carlton Crossing Drive, but solely on what the robbers believed were the proceeds of the China Wok.

Additionally, unlike *Wang*, the evidence of the impact on interstate commerce was far more than *de minimis*. This Court has not adopted *Wang's* requirement of a heightened "substantial connection" when a robbery occurs in a private residence. The law in this Circuit recognizes that where a defendant's actions would have the effect of depleting assets of engaging in interstate commerce, a *de minimis* showing, without more, is sufficient. *United States v. Buffey*, 899 F.2d 1402, 1404 (4th Cir 1990).

At trial, the Government established that the China Wok restaurant was open 364 days a year. JA 333. Testimony of W.P.C. established that the business would have dozens of customers a day. JA 333. The business owners made weekly purchases of supplies from out-of-state suppliers. JA 331. Following the attempted robbery and murder of her husband and business partner, H.Z., the business was closed for about one month. JA 340. The Government made more than the *de minimis* showing required under the law. Even assuming the analysis utilized by the *Wang* court applied here, the Government has shown a substantial connection between the actions of the Defendant and his coconspirators, as well as the relationship of the victims to the business engaged in interstate commerce.

This Court has held that targeting the proceeds of a business engaged in interstate commerce is sufficient for the jurisdictional nexus for the Hobbs Act statute. *See United States v. Taylor*, 754 F.3d 217, 225 (4th Cir. 2014), *aff'd*, 136 S. Ct. 2074 (2016) ("Under the targeting theory, a defendant who robs a victim in the belief that he will recover the proceeds of an enterprise engaged in interstate commerce will not fortuitously escape prosecution under the Hobbs Act because his target

did not possess those proceeds at the precise time of the robbery."); *United States v. Donahue*, 607 F. App'x 233 (4th Cir. 2015) (unpublished).

Wiley places significant importance on the characterization of the proceeds once they left the physical confines of China Wok. It appears this argument relies on the assumption that once those proceeds break the plane of the business threshold and are taken outside, they forever lose their characteristics as business proceeds and are converted to personal funds never again to be used for investment in the business. Separately, Wiley argues there was insufficient evidence that the alleged conspirators knew of China Wok's connection to interstate commerce or that the Zheng family was targeted because their restaurant engaged in interstate commerce. Def. Br. at 17. This argument has no basis in law and the defendant provides no citation for that argument.

Wiley's argument attempts to graft onto the elements of conspiracy to use a firearm in a crime of violence an additional element, that the victims were targeted *because* their restaurant was engaged in interstate commerce. There is no such legal requirement. This Court has held that the Government is not required to show that defendant intended to affect interstate commerce, only that his actions were likely to affect interstate

commerce, even though the actual impact on commerce is small. *Taylor*, 754 F.3d at 224. Moreover, there is no requirement that a defendant have knowledge that interstate commerce is actually affected. *See United States v. Strayhorn*, 743 F.3d 917, 925 (4th Cir. 2014) (citing *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990)); *see also Taylor*, 754 F.3d at 222; *United States v. Spagnolo*, 546 F.2d 1117, 1119 & n.5 (4th Cir. 1976) ("It is of no moment whether the defendants intended or contemplated an effect on commerce . . . ."). Given these principles, it makes little sense that the Government would be required to prove that the defendant knew that the business engaged in interstate commerce or that he targeted the business because it engaged in interstate commerce. Here, there was clearly sufficient evidence to show that the conspirators entered into an unlawful agreement to possess firearms during a crime of violence. As previously noted by this Court, a Hobbs Act robbery is a crime of violence.

Wiley was convicted in Count Two of *attempted* Hobbs Act robbery. As noted in *Taylor* above, even if business proceeds were not present at the time of the robbery, targeting of those proceeds is all that is required. It is a long-standing proposition that factual impossibility is not a defense

to a charge of attempt. *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003).

The attempted robbery at issue here had a direct link to the business that was engaged in interstate commerce. The jury had substantial evidence that the robbers believed the victims would be in possession of business proceeds, the attempted robbery targeted those proceeds, the attempted robbery occurred mere minutes after that business had closed for the day and the robbery occurred a short distance away from the business, but before the victims got inside their residence. Contrary to Wiley's implied argument, the Hobbs Act statute contains no provision that limits its application to the physical confines of the business. *See United States v. Powell*, 693 F.3d 398, 404 (3rd Cir. 2012) ("The link to commerce was more direct: Powell specifically targeted the proceeds of businesses engaged in interstate commerce. Accordingly, although they took place outside the confines of the victims' stores, the robberies here were nonetheless 'directed at a business establishment,' which Powell concedes lies within Hobbs Act jurisdiction. . . Targeting of this sort satisfies the Hobbs Act's jurisdictional nexus.").

### III. THE DISTRICT COURT DID NOT CLEARLY ERR IN RULING AGAINST WILEY'S *BATSON* CHALLENGE WHERE THE GOVERNMENT OFFERED A RACE-NEUTRAL REASON FOR ITS STRIKES AND THE COURT FOUND THAT REASON CREDIBLE.

A.    Standard of Review

Wiley seeks to vacate his convictions with a *Batson* challenge.  The district court conducted a thorough hearing on his *Batson* challenge and denied the same. JA 86-102. This Court accords great deference to a district court's *Batson* determination and reviews such a ruling only for clear error. *United States v. Dinkins*, 691 F.3d 358, 379–80 (4th Cir. 2012) (citing *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008)). Because there was no error, much less clear error, this Court should affirm.

B.    Discussion

Prior to jury selection, the district court provided jurors a questionnaire with questions it formulated. The clerk provided the parties with jury questionnaires that contained affirmative answers. JA 1562-1564. The parties had approximately twenty minutes to review all the questionnaires in the courtroom prior to jury selection and were not provided any information regarding race either on the forms or from any

other source, prior to the juror venire actually entering the courtroom. JA 1562-1564. One of the questions, hereinafter "Question 4" on the jury questionnaire, asks, "Have you or any of your family members ever been plaintiff or defendant in a court case (criminal, civil or domestic)?" JA 1565. Both of the jurors Wiley now complains were improperly excluded had answered "yes" to that question. JA 1565, JA 1569.

Prior to jurors entering the courtroom, the Government told the district court there may be additional questions for certain jurors—Juror Riddle, Juror Ingram, and Juror Brandis—based upon their affirmative answers to Question 4. JA 36-38. Court records show that Jurors Riddle and Ingram self-identified as black, and Juror Brandis self-identified as white. JA 1559-1560.

During jury selection, the two jurors subject to Wiley's *Batson* challenge, Jurors Riddle and Ingram, either did not disclose or did not disclose fully the underlying circumstances of their "yes" answer to Question 4. Juror Riddle said nothing to the court despite previously indicating that her brother had been involved in a drug charge in response to Question 4. JA 99-101. Juror Ingram disclosed a circumstance regarding her uncle when questioned by the court. JA 81.

Notably, Juror Ingram did not mention or explain why she had written "sister" as to Question 4. *Id.* This failure to give any information regarding the "sister" in response to Question 4 was noted by the Government. JA 105, JA 108. This silence regarding the "sister" persisted even after the court asked Question 4 again. JA 111-112. The failure to provide an answer regarding the "sister" was proffered by the Government and accepted by the court as a race neutral reason for the Government's peremptory strike of that juror. JA 123.

Wiley argues the Government's decision to strike two jurors because of their failure to fully disclose information about matters provided on the court's questionnaire was pre-textual. Def. Br. at 25. This Court has noted that there is there is a three-step test for proving a *Batson* violation:

> First, the defendant must make a prima facie showing that the government exercised a peremptory challenge on the basis of race. Second, once the defendant has made such a prima facie showing, the burden shifts to the government to provide a non-discriminatory reason for its use of the peremptory challenge. Third, the defendant next must establish that the government's proffered reasons were pretextual, and that the government engaged in intentional discrimination.

*Dinkins*, 691 F.3d at 380; *see also United States v. Barnette,* 644 F.3d 192, 203–04 (4th Cir. 2011). The standard is high. The district court heard

arguments of counsel and applied the three-step analysis. JA 116. When Wiley made his *Batson* challenge, the district court asked, and the Government provided, a race neutral reason for its exercise of peremptory challenges, even though not required to at that point since the court had not ruled whether a *prima facia* case had been made. JA 102-105.

Courts have held that when a race neutral reason is proffered and the court ultimately rules on the issue, the question of a *prima facia* showing is moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Likewise, this Court has sometimes moved from *Batson* step one to *Batson* steps two and three by examining such an explanation, once the Government has offered it, without assessing the strength of a *prima facie* case. *See, e.g.*, *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994).

As here, a district court will then consider the Government's reason for this exercising its peremptory strikes. As to a race neutral reason "[t]he government's explanation need not be persuasive, or even plausible, as long as it is neutral." *United States v. Grimmond*, 137 F.3d 823, 834–35 (4th Cir. 1998). Although the government's explanation need

not be persuasive, it must not be a "pretext" for discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 479–86 (2008).

Here, the Government's race-neutral explanation was clear: the jurors failed to disclose or fully disclose that a close family member or friend had been involved in a court case contrary to information they had earlier provided to Question 4. Once the government advances a race-neutral reason for striking a juror, the burden shifts back to the defendant to prove "purposeful discrimination" in order to satisfy the third step of *Batson*. *Hernandez*, 500 U.S. at 359 (1991); *accord Matthews v. Evatt*, 105 F.3d 907, 917 (4th Cir. 1997). To satisfy this requirement, Wiley argues the Government declined to strike another juror—who was white—who failed to disclose the involvement of a close family member or friend in a criminal offense. Def. Br. at 28-29. To be sure, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

However, the two *venire* members in this case were not similarly situated and thus Wiley's comparative argument fails. Contrary to his

assertion, (Def. Br. at 28-29), Juror Brandis, who was white, fully disclosed the substance underlying his response to Question 4. JA 1567-1568. As noted *supra*, prior to the beginning of jury selection the Government noted that Juror Brandis had an affirmative answer as to Question 4. JA 37. The court asked, "Has anyone been the victim of a crime or close friend who has been the victim of a crime?" Whereas Juror Ingram noted her uncle, but made no reference to her sister, regarding Question 4, Juror Brandis volunteered details about the information in response to the court's question, immediately after Juror Ingram:

> THE COURT: Okay. And then who else? Mr. Brandis, you had your hand up, sir?
>
> PROSPECTIVE JUROR NO. 3: Yes, sir.
>
> THE COURT: What type of crime and who was involved?
>
> PROSPECTIVE JUROR NO. 3: Simple assault on a female.
>
> It was my wife, and the stepson was the perpetrator.
>
> THE COURT: When was that?
>
> PROSPECTIVE JUROR NO. 3: Twenty-two years ago.
>
> THE COURT: Is there anything about that incident that you think would affect your ability to be fair and impartial in this case?
>
> PROSPECTIVE JUROR NO. 3: No, Your Honor.

THE COURT: All right. Were you involved at the time in terms of working with law enforcement?

PROSPECTIVE JUROR NO. 3: Yes, Your Honor.

THE COURT: Which law enforcement agency was involved?

PROSPECTIVE JUROR NO. 3: The Forsyth County Sheriff's Department.

THE COURT: Okay. Can you set that incident aside and decide this case without regard to what may have happened in that incident?

PROSPECTIVE JUROR NO. 3: Yes, Your Honor.

JA 81-83.

Thus, whereas Juror Brandis gave full disclosure regarding the information contained in Question 4, Jurors Ingram and Riddle did not. Therefore, the jurors were not similarly situated. Furthermore, a reasonable inference from the record is that the district court acknowledged that Juror Brandis was not in the same position as Jurors Ingram and Riddle when it noted:

It's true that two of the three that were struck were African-American, but they both did the same thing; they both did not disclose information that was on their forms. And they are the only two that have been brought to my attention who are in that situation, that failed to disclose what was on their forms when given the opportunity to [in] open court. In fact, others who were not struck did disclose such information.

> So, on this record, I'm going to find that the Defendant has not carried his burden to show that the pretext was the -- that the Government's reason was pretextual and that race was the real reason for the strike. So I will deny the motion.

JA 131.

When Wiley advanced his *Batson* challenge before the district court, he sat silent with regard to juror Brandis's alleged lack of disclosure. Thus, this is not a situation where the three jurors were similar in every respect but race. *See, e.g.*, *Barnette*, 644 F.3d at 216–17 (declining to find clear error where district court concluded that a comparative juror analysis was not evidence of racial discrimination in light of distinguishing characteristics among the relevant jurors).

Moreover, Wiley's reliance on *Miller-El v. Dretke*, 545 U.S. 231 (2005), is misplaced. Def. Br. at 30-31. In *Miller-El*, the Court found a pattern of disparate questions problematic in the context of several factors it used to determine a *Batson* challenge was improperly denied. Unlike in *Miller-El*, the Government did not strike a majority of African-Americans, did not manipulate the seating of the jury panel, does not have a history of race-based challenges and there is no evidence that Question 4 of the district court's questionnaire was utilized as "trickery,"

or had been specifically designed to create an excuse for a peremptory strike. *Miller-El*, 545 U.S. at 261. Instead, the district court apparently designed Question 4 to elicit information about court system experiences of jurors and their families. Wiley presents no evidence, nor can he, that the Government believed African-American jurors were less likely than members of other races to fully answer Question 4, when questioned before the court.[7]

The district court asked Wiley to offer argument that the Government's stated reasons where pre-textual or to produce evidence of intentional prejudice. JA 127-130. No evidence was put forward. Instead, counsel for Wiley merely restated his argument that a *prima facie* case had been established. JA 127. Furthermore, because a district judge's findings under *Batson* "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."

---

[7] Wiley argues that Question 4 was asked in an inconsistent manner. Def. Br. at 25-27. However, that argument ignores the context of how jurors were questioned. All jurors in the *venire* were present in the courtroom while other jurors were questioned *by the court* and were admonished to pay attention to all questions, including Question 4 as it was repeated, whether they were presently seated in the jury box, or not. JA 142, 157, 164, 175, 183.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2224 (2019) (quoting *Batson*, 476 U.S. at 98 n.21). This Court has noted, "The district court is especially well suited to make this assessment because the court 'has observed with its own eyes the very act in dispute.'" *Dinkins*, 691 F.3d at 379-80 (quoting *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995)).

> In denying Wiley's *Batson* challenge the court noted:
>
> Let me just -- I want to make something clear that hopefully was clear before, and, that is, on the *Batson* challenge, ultimately there is a question of credibility. I found, and I am expressly finding, that based on my assessment of the credibility and the reasons offered by the assistant U.S. attorney in the case, that the reason for the challenges were based on the inconsistency between the responses orally in court and the responses on the written forms. And that's based on my assessment of the credibility of the lawyers, and Mr. Green, in particular. And I'm expressly finding that that was the reason—legitimate reason the Government offered for its reasons and that it's not based on race.

JA 140.

Finally, although Wiley never again raised a *Batson* challenge during jury selection, this Court has held that when determining whether there has been purposeful discrimination a court may consider the ultimate racial makeup of the jury. *United States v. Joe*, 982 F.2d 99, 103 (1991); *United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989). It appears the district court remained cognizant of this principle

throughout the jury selection process. The court noted the Government, in its initial exercise of preemptory challenges, did not exclude Juror Okafor who is black. JA 116, JA 1559. Additionally, the district court noted that the final racial makeup of the jury included five African-Americans. JA 344.

The district court acted carefully and cautiously to ensure Wiley's constitutional rights were protected during jury selection. The Government offered a permissible, race-neutral explanation for its challenged strikes, and Wiley cannot show clear error in the district court's ruling that he had failed to prove purposeful discrimination. Wiley's *Batson* challenge is meritless.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FOLLOWING FOURTH CIRCUIT LAW REGARDING CLOSING ARGUMENTS THAT ATTEMPTED TO DEFINE REASONABLE DOUBT.

### A. Standard of Review

Wiley argues the district court erred by refusing to allow counsel to attempt to define reasonable doubt in closing argument by referencing a definition he did not propose to the court prior to making his argument. Def. Br. at 31. The standard of review for evaluating this argument is abuse of discretion, not *de novo* as argued by Wiley. *See United States v.*

*Headspeth*, 852 F.2d 753, 756 (4th Cir. 1988). The district court did not abuse its discretion by sustaining the Government's objection.

B.   Discussion

Wiley attempts to challenge the validity of the jury instruction on reasonable doubt itself, despite lodging no objections to it at the district court level. Def. Br. at 37. Addressing the jury instruction specifically, there was no error by the district court. Because Wiley agreed to the jury instructions on reasonable doubt, any argument on appeal should be reviewed using the plain error standard. *See United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014). Further, the district court's decision to sustain the Government's objection to defense counsel's attempt to define reasonable doubt in closing argument was not an abuse of discretion. *See Headspeth*, 852 F.2d at 756.

Wiley asserts that the jury instruction on reasonable doubt left the jury "with the impression that the burden of proof that the government was required to carry in Appellant's case was lower than actual proof beyond a reasonable doubt." Def. Br. at 37. To the extent Wiley now objects to the jury instruction on reasonable doubt, (Def. Br. at 37), the Government contends  this argument has been forfeited because Wiley

did not object in the district court. JA 1300-1313. Objections to jury instructions not properly preserved for appeal are reviewed for plain error. *United States v. McCaskill*, 676 F.2d 995 (4th Cir. 1982); Fed. R. Crim. P. 30 and 52(b).

Prior to closing arguments, Wiley and the Government submitted joint proposed jury instructions to the district court including an instruction on reasonable doubt. Proposed Jury Instructions, 1:19CR529 (M.D.N.C.), ECF No. 268. The attempt to define reasonable doubt Wiley now complains he was not allowed to make was not submitted by Wiley in the joint proposed final jury instructions. *Id*. Furthermore, when the district court presented the parties with its proposed final jury instructions and indicated it had made a modification to the proposed reasonable doubt instructions, defense counsel did not object to the instruction, nor did Wiley ask for an additional instruction related to reasonable doubt. JA 1300-1313. A jury instruction not requested is waived. *United States v. Matzkin*, 14 F.3d 1014, 1018 (4th Cir 1994).

Thus, any objection concerning those agreed-upon jury instructions should be reviewed under plain error. In questions involving plain error: (1) there must be an error; (2) the error must be plain; and (3) the error

must affect substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). If the three elements of the plain error standard are met, the Court may exercise its discretion to notice error only if the error seriously affects "the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (citation omitted).

Here, there was no error. The district court's jury instruction on reasonable doubt is substantially the same has long been approved in this Circuit. *See United States v. Williams*, 152 F.3d 294, 297-98 (4th Cir. 1998). Similar to the arguments presented here, the defendant in *Williams* contended the instruction was given in error because it did not define the term reasonable doubt, or alternatively, that the offered definition was incomplete and "improperly reduced the government's burden of proof." *Compare id.*, *with*, Def. Br. at 35-37. This Court rejected those arguments, noting that "because of our belief that efforts to define reasonable doubt are likely to confuse rather than clarify the concept, we have repeatedly held that a district court need not, and in fact should not, define the term 'reasonable doubt' even upon request." *Williams*, 152 F.3d at 297-98. As is consistent with this Court's previous analysis of

similar jury instructions on reasonable doubt, the one given here by the district court (unobjected to by defense counsel) was not error. *See id*.

Wiley now argues the district court should have permitted defense counsel to define reasonable doubt to the jury during closing argument, consistent with language found in jury instructions from the Fifth Circuit. Def. Br. at 36. However, the law in this Circuit is well-settled: "a district court may restrict counsel from arguing definitions of reasonable doubt." *United States v. Patterson*, 150 F.3d 382, 389 (4th Cir. 1998) (citing *Headspeth*, 852 F.2d at 756; *United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987)).

In *Crockett*, this Court determined there was no abuse of discretion in the district court's refusal to permit elaboration of reasonable doubt in closing argument. *Crockett*, 813 F.2d at 1317. The Court reasoned, "[a]lthough a trial court cannot, of course, prohibit closing argument entirely, it can limit closing argument to 'ensure that argument does not . . . impede the fair and orderly conduct of the trial." *Id*. (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)).

This issue was raised again in *Headspeth* where this Court found no abuse of discretion in the district court's refusal to allow defense

counsel to define reasonable doubt in closing argument. *Headspeth*, 852 F.2d at 756. This Court concluded, "[t]his argument is flatly refuted by our decision in *United States v. Crockett*, 813 F.2d 1310 (4th Cir. 1987), which held that it was not an abuse of discretion to limit closing argument in this fashion." *Id*. In *United States v. Smith*, this Court again addressed the issue of defense counsel defining reasonable doubt in closing argument. 441 F.3d 254 (4th Cir. 2006). There, defense counsel "gave the jury four definitions of reasonable doubt. During the fourth definition, the district court interjected, saying, 'I hate to interrupt you, but not even the Court is permitted to define reasonable doubt in the Fourth Circuit for the jury, so, respectfully, do not attempt to define it for them.'" *Smith*, 441 F.3d at 270. The district court further referenced defense counsel's definitions of reasonable doubt in the jury instructions, noting that the jury was "not bound to accept [counsel's] definition of reasonable doubt." *Id*. This Court concluded the district court did not abuse its discretion, stating succinctly, "[h]ere, the district court allowed counsel to define reasonable doubt three times, prohibiting only the presentation of a fourth definition. There was no abuse of discretion." *Id*.

Wiley's counsel, like defense counsel in *Smith*, was permitted to make almost his entire analogy defining reasonable doubt to the jury, which he now complains was excluded. JA 1357-1359. Here, the district court made no commentary concerning the accuracy of defense counsel's definition and simply informed the jury that the Court would define the standard. The following exchange occurred following the Government's objection:

THE COURT: All right. Do you have any further you're going to argue on that?

MR. BRYSON: I would say, while it's not an instruction adopted in this circuit, that certainly many circuits have adopted the "rely and act upon without hesitation the most important of your own affairs," and so I don't think my analogy is wrong when it comes to the actual definition of proof beyond a reasonable doubt. But I have stayed away from actually using those terms because of how the Court has admonished us.

THE COURT: Right. Do you want to be heard anymore?

MR. GREEN: No.

THE COURT: Well, my concern is, as the Government points out, that it does sound like you're relating it to a business deal. And people may enter into business deals for different reasons. I don't know that -- well, I'm troubled by the analogy.

Hold on just a minute. Let me think about it.

[(Pause in the proceedings.)]

THE COURT:    Okay. I'm inclined to sustain it because the jury is not being asked to enter any deal with Mr. Cox. They're just asked to determine whether they believe what he says about this event, which is different from a business deal. So I'm a little troubled by the nature of the analogy in this instance. I think you are free to argue you can't believe him for all the reasons you indicated, but I don't know that the standard of entering into a business deal is one of reasonable doubt or not.

JA 1360-1362.

After further consulting with the parties, the Court informed the

jury as follows:

(End of bench conference.)

THE COURT:    The Court is going to sustain the objection. Ladies and gentlemen, I'll instruct you as to the standard for reasonable doubt.

    All right. You may proceed.

JA 1363.

Unlike *Smith*, where the district court interrupted defense counsel

without an objection by the Government to caution the defense counsel

against defining reasonable doubt, here there was a one-word objection

by the Government, followed by a bench conference, and then an

instruction from the bench. *See Smith*, 441 F.3d at 270; JA 1363. Further,

the district court in *Smith* again referenced defense counsel's definitions

of reasonable doubt and told the jury they did not need to accept them. *Smith*, 441 F.3d at 270. Here, the district court did not again mention defense counsel's attempt to define reasonable doubt and advised the jury using language previously agreed upon by the parties. JA 1369-1370.[8] Also, after the court gave its final jury instructions, the defendant again had no objection to the district court's instruction on reasonable doubt. JA 1403, JA 1406.

In summary, the long-standing rule in this Circuit provides it is not an abuse of discretion for the district court to limit counsel from arguing definitions of reasonable doubt. *See Headspeth*, 852 F.2d at 756; *Patterson*, 150 F.3d at 389; *Crockett*, 813 F.2d at 1317. The district court properly exercised its discretion by prohibiting defense counsel from continuing to define reasonable doubt in his closing argument beyond the instruction agreed upon by the parties. There was no abuse of discretion in this limitation.

---

[8] The jury was instructed to weigh accomplice testimony carefully. JA 1376. Jury instructions are taken as a whole to determine whether they fairly state the controlling law. *United States v. Cobb*, 905 F.2d 784, 78-89 (4th Cir. 1990).

## <u>CONCLUSION</u>

This Court should affirm the judgment of the district court.


Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney


/S/ GRAHAM T. GREEN
Assistant United States Attorney
NCSB #22082
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351


/S/ CRAIG M. PRINCIPE
Assistant United States Attorney
NCSB #44720
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Phone:  336/333-5351


Date: October 4, 2022

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### Effective 12/01/2016

No. 21-4458    Caption: United States v. Maurice Owen Wiley, Jr.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   X    this brief or other document contains 12,987 words

   ____    this brief uses monospaced type and contains lines

This brief or other document complies with the typeface and type style requirements because:

   X    this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14 **or**

   ____    this brief or other document has been prepared in a monospaced typeface using _____ in _____ .

(s) AUSA Craig M. Principe
Party Name: United States of America /Appellee
Dated: October 4, 2022

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 4, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

John D. Bryson, Esquire

Mark P. Foster, Jr., Esquire

/S/ CRAIG M. PRINCIPE
Assistant United States Attorney
NCSB #44720
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Phone:  336/333-5351